33 A.3d 932

Linda FREILICH, et al.

v.

UPPER CHESAPEAKE HEALTH SYSTEMS, INC., et al.

No. 4, Sept. Term, 2011.

Court of Appeals of Maryland.

Dec. 19, 2011.

Paul S. Blumenthal (Law Office of Paul S. Blumenthal, P.A., Annapolis, MD), on brief, for Petitioners.

Jonathan B. Sprague (Kathleen M. Chancler of Post & Schell, P.C., Philadelphia, PA; Craig B. Merkle and K. Nicole Nesbitt of Goodell, Devries, Leech & Dann, LLP, Baltimore, MD), on brief, for Respondents.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, * MURPHY, ADKINS and BARBERA, JJ.

ADKINS, J.

In this case we must determine the relevance of, and how to prove, a hospital's alleged retaliatory animus in refusing to renew a physician's privileges on the defendants' motion for summary judgment based on the Health Care Quality Improvement Act of 1986 ("HCQIA"), 42 U.S.C. §§ 11101–11152 (1994). After Harford Memorial Hospital ("Harford") declined to renew the privileges of Dr. Linda Freilich,[1] she sued

---

* Murphy, J., now retired, participated in the hearing and conference of this case while an active member of this Court but did not participate in the decision and adoption of this opinion.

1. Dr. Freilich also named as defendants the Board of Directors of Harford ("the Board"), individual members of the Board, and Upper Chesapeake Health System ("Upper Chesapeake"), a nonprofit corpora-

for damages. Harford claimed immunity under HCQIA.[2] The Circuit Court for Harford County granted summary judgment to Harford, and the Court of Special Appeals affirmed. We granted *certiorari, Freilich v. Upper Chesapeake Health Sys., Inc.,* 418 Md. 586, 16 A.3d 977 (2011), to answer the following question as phrased in the petition:

> In the context of a summary judgment proceeding is the presumption of HCQIA immunity rebutted upon the showing of material facts in dispute regarding the physician's reporting of substandard medical care and attempts to improve the quality of care in the hospital system?

█ We shall affirm the Court of Special Appeals. Although we hold that evidence of retaliatory motive on the part of a disciplinary body is relevant when offered to rebut the presumption of HCQIA immunity, special standards must be met in order for such evidence to defeat summary judgment. Evidence of retaliation will not prevent summary judgment on HCQIA immunity unless it can permit a rational trier of fact to conclude that (1) the defendant failed to comply with the standards for immunity set forth in 42 U.S.C. § 11112(a) or (2) the action was not a "professional review action" under 42 U.S.C. § 11151(9). We explain this below as we discuss these sections of HCQIA.

---

tion that operated Harford and Fallston General Hospital ("Fallston"), another hospital at which Dr. Freilich had privileges. For convenience and clarity, we refer to the collective defendants in this case as "Harford."

2. Dr. Freilich also sued for declaratory and injunctive relief, but those claims are not before us. The question presented in Dr. Freilich's petition for *certiorari* deals only with HCQIA immunity, and HCQIA immunity applies only to claims for damages. 42 U.S.C. § 11111(a); *see also Singh v. Blue Cross/Blue Shield of Mass., Inc.,* 308 F.3d 25, 44 (1st Cir.2002) (holding that "HCQIA immunity only covers liability for damages"). Dr. Freilich also failed to raise claims for declaratory and injunctive relief in her briefs. Therefore, even though Dr. Freilich's attorney mentioned the possibility of declaratory and injunctive relief during oral argument, those claims are not before us, and we will not disturb their disposition in the Court of Special Appeals.

## FACTS AND LEGAL PROCEEDINGS

Between 1982 and 1997, Petitioner Dr. Freilich practiced medicine at two hospitals in Harford County: Harford Memorial Hospital ("Harford") and Fallston General Hospital ("Fallston"). The hospitals were operated by Upper Chesapeake Health System ("Upper Chesapeake"), a nonprofit corporation.[3] She specialized in internal medicine and nephrology.

During her time at the hospitals, Dr. Freilich was the subject of numerous complaints. Although some of the complaints addressed her competence as a physician, most of them alleged unprofessional behavior and violations of ethics rules. At least 35 complaints were filed against Dr. Freilich by doctors and members of the hospital staff, and at least 33 complaints were filed by patients.

■ Dr. Freilich argues generally that the complaints against her were made in retaliation for her legitimate reporting of substandard medical care and efforts to improve the hospitals. But she offers no evidence of retaliatory motive "in detail and with precision," as required to fend off summary judgment,[4] with regard to any of the following complaints alleged about her:

- Dr. Freilich "told [a] patient he was just fat and go on a diet."
- She told a nurse, "We don't want you here. Get out. I can make life miserable for you."
- Dr. Freilich told a hospital employee, "Every time I am written up, I will write you up ten times."
- When a nurse wanted to give pain medication to an alcoholic with pancreatitis, Dr. Freilich allegedly said, "I want him to be miserable. He did this to himself."

---

**3.** Fallston closed in October of 2000 and reopened under a different name.

**4.** At summary judgment, a plaintiff must present material facts "in detail and with precision." *Goodwich v. Sinai Hosp.*, 343 Md. 185, 207, 680 A.2d 1067, 1078 (1996) (quoting *Gross v. Sussex, Inc.*, 332 Md. 247, 255–256, 630 A.2d 1156 (1993)).

- She told a patient who smokes, "I hate people who smoke."
- She told a patient, "You are a three-time loser and you will be back."
- She publicly humiliated a patient and then told another patient who had observed the incident that "she could avoid that embarrassment if the patient would stop coming to the emergency room in a drunken stupor."
- She was uncooperative with patients' requests for transfer.
- She was "uncooperative numerous times in notifying families of patient deaths."
- In 1997, patients were surveyed about their satisfaction with their attending emergency room doctor. No other physician had more than one person choose "dissatisfied" or "somewhat dissatisfied," but Dr. Freilich had nine people (out of 22) choose that option.
- Thirty-three patients independently complained to the hospital about Dr. Freilich.
- After losing privileges at Fallston, she told a patient at Harford, in a semi-public room, "It's a good thing you are in here because too many people go out of Fallston in boxes." The patient was "horrified."
- She told a patient's daughter "in essence that ICU physicians were trying to kill her mother and that she needed to get to the hospital immediately." This was apparently because of a disagreement between Dr. Freilich and another doctor about how a certain patient should be treated. The daughter reported this incident to three different people at the hospital.
- Dr. Freilich "violated the privacy of a 17 year old admitted to the BHU" by releasing information regarding his admission and positive test results to his parents without first discussing it with the attending psychiatrist. (The MEC Subcommittee believed that she may not have been aware of a law regarding the privacy of emancipated minors and mental health records.)

- She failed to comply with MEC's recommendation that she seek counseling and follow a treatment plan (if needed) in 1996, resulting in revocation of her privileges in 1997.
- She refused to meet about the concerns and complaints against her.
- On the application for renewal of privileges at Harford, she made misrepresentations about her loss of privileges at Fallston. She incorrectly stated that there "were never any quality concerns" with her work, "no witnesses or corroboration of any unprofessional behavior" on her part and "in fact, the only witness, a patient of [hers], completely supported [her] testimony." Her excuse for making the misstatement about the witnesses was that she "thought witness means something like the witnesses who sign in a will."
- She documented that she had examined patients and put the documentation in their medical records, but patients denied that she had examined them.
- She gave "untruthful testimony" before the hearing committee. In particular:
  - She prepared a binder full of "thousands" of signatures on a petition for her to keep her privileges. She represented to the hearing committee that the signatures were of her patients when, in fact, she had found people who were not her patients and asked them to sign.
  - Even though she had met numerous times with the committee at both hospitals to discuss her behavior, she testified under oath, "I was never told my behavior was inappropriate."
  - She later admitted to having been told that she had behavioral problems at other institutions where she worked, and when the examiner asked her where exactly, she responded, "I really wasn't thinking of any other institutions." When pressed about her previous statement, she said, "I didn't say that."

There were fewer instances, according to evidence from Dr. Freilich, in which complaints were made by persons with a retaliatory motive:

- Dr. Freilich refused to allow a patient to die because she believed he was no longer terminal, and she followed the statutory procedure for transfer to another doctor. The result, she says, was that she was written up for "not being cooperative."

- Dr. Freilich complained that the Social Service Department was inefficient and was not performing its job properly. The retaliation, she says, was a complaint filed against her regarding her interaction with a family on the telephone.

- A patient who was abusing diuretics and laxatives, which Dr. Freilich said can be consistent with suicidal intentions, was admitted 30 times to Harford without being referred to a psychiatrist. Dr. Freilich discovered this oversight and immediately transferred her to Fallston for a psychiatric evaluation. The ER personnel were not prepared to receive the patient, and the MEC accused Dr. Freilich of having abandoned the patient.

- She complained to Pam Aitken, Program Administrator of the Transitional Care Unit ("TCU") at Harford,[5] regarding a patient with skin problems. According to Dr. Freilich, Aitken wrote a retaliatory letter to the Medical Director of the TCU, Dr. Suresh Dhanjani, setting forth four complaints against Dr. Freilich:

  - (1) She failed to provide proper treatment to a patient with a necrotic ulcer because she didn't know it was necrotic, even though there was documentation in the patient's record showing that she was indeed aware of the condition.

  - (2) She told the wife of another doctor's patient that "her husband was dying," that the Transitional Care

---

**5.** This appears to be her title based upon her signature on a letter that she wrote to Dr. Suresh Dhanjani on October 15, 1998.

Unit was an inappropriate place for him, and that he needed to be placed in long-term care. She said the same thing to other staff members in the nurse's station, a "very public place . . . accessible by family, patients and other staff, resulting in a violation of confidentiality." This incident led to a "long conversation with the patient's wife to 'calm her down,' and, indeed it appears that arrangements were already in the works to have the patient go home with appropriate home care."

- (3) She performed a consult on a patient before the order for a consult was obtained from the attending physician.

- (4) She spoke about patients while in open areas in which staff and patients could hear, including saying that a certain patient was not an appropriate admission to the rehabilitation unit and would not get better or benefit from being there.

- An ongoing conflict existed between Dr. Freilich and Dialysis Management of Maryland ("DMM"). Dr. Freilich states that although her "company submitted the low bid" to perform dialysis services at Upper Chesapeake, "the contract was given to an out of county contractor, Dialysis Management of Maryland which began operations in 1995; however the dialysis services did not improve." As a result, she "continued to complain about quality issues" on the dialysis unit, and in return received what she called "retaliation . . . via sham complaints." On the record before us, at most five of those complaints were in the record considered by the Board:

  - She said "get the hell out" to a nurse and that she did not want the nurse or her dialysis machines in Harford County.

  - She stated in front of a patient that "DMM was at [Fallston] because the bosses were white males and 'good old boys' and [Fallston] was a country club where patients were brought in to waste time and fill beds."

- She complained about "providing incorrect dosages of Epogen, using incorrect sizes of dialyzers and staffing issues," which led to sham "quality assurance" evaluations of Dr. Freilich by dialysis nurses.

- She admonished "two contracted dialysis nurses" for abandoning a patient on dialysis and nearly causing his death. They filed retaliatory complaints against her, with one of the nurses even admitting that Dr. Freilich was the subject of a "witch hunt."

- A dialysis nurse complained "about several incidents with Dr. Freilich, including confrontations in front of patients, Dr. Freilich trying to persuade her to quit [and] change her testimony."

Petitioner points to nothing in the record to show that these retaliatory-based complaints served as the basis for the Board's decision.

### Investigations and Hearings

After Fallston suspended Dr. Freilich's privileges on July 9, 1997, citing "unprofessional behavior," Harford began investigating her as well.[6] Harford's Medical Executive Committee ("MEC") convened a subcommittee on December 18, 1997, to investigate her alleged misconduct in the hospital's psychiatric unit. In response, Dr. Freilich voluntarily withdrew from the psychiatric unit but continued practicing in other parts of the hospital. The subcommittee met again on February 19, 1998, and recommended that Dr. Freilich "continue to remain off the [psychiatric unit]."[7]

---

6. Although Fallston was a part of the Upper Chesapeake Health Systems, Dr. Freilich's lawsuit does not challenge her dismissal from Fallston. She was dismissed from Fallston after failing to comply with the recommendation of Fallston's Medical Executive Committee that she "participate with the Med Chi Physician Rehabilitation Program, or seek consultation with an individual acceptable by the Senior Vice President of Medical Affairs and the President of the Medical Staff as a requirement for maintaining privileges."

7. This decision was made by a vote of five doctors.

Incidentally, Dr. Freilich's appointment at Harford was scheduled to expire on December 31, 1998, which required her to file an application for reappointment with Upper Chesapeake. As we explain later, Dr. Freilich made several incorrect and misleading statements about her suspension at Fallston.

In response to Dr. Freilich's application, Harford's Credentials Committee proposed a "conditional one year reappointment" during which she would be monitored for professionalism and behavior issues.[8] The MEC agreed and recommended a one year reappointment. Fourteen physicians and five non-physicians voted on this recommendation. Ultimate authority, however, rested with Harford's Board of Directors, which decided to reappoint Dr. Freilich for only four months, during which time "management, legal counsel and the Medical Staff" were to investigate the complaints against her. The Board was to meet at the conclusion of the four months and decide whether to fully reappoint her.[9]

During Dr. Freilich's conditional four-month reappointment, a committee of seven physicians, chaired by Dr. Barry Wohl, investigated her case. Dr. Freilich met personally with the committee and communicated with Dr. Wohl by letter several times. The committee met three times during Dr. Freilich's conditional reappointment. Ultimately, Dr. Wohl's committee recommended that Dr. Freilich be required to complete a communication course.

The MEC, however, disagreed and recommended that the Board simply deny Dr. Freilich's application for reappointment.[10] The Board adopted the MEC's recommendation on April 13, 1999, deciding not to reappoint Dr. Freilich. The Board provided her with temporary privileges, however, so

---

8. Six physicians and five non-physicians voted on this proposal.

9. The six physician members of the seventeen-member Board abstained from voting on this decision.

10. Eleven physicians and one non-physician voted on this recommendation.

that she could appeal and have a hearing as provided under Harford's bylaws.[11]

At Dr. Freilich's request, Upper Chesapeake convened an Ad Hoc Hearing Committee ("Hearing Committee"), consisting of four physicians and a hearing officer, to hear her objections to the Board's decision. The Hearing Committee met several times between September 30, 1999, and January 11, 2000, listening to testimony from Dr. Freilich, members of Dr. Wohl's committee, and others. On January 27, 2000, the Hearing Committee unanimously recommended a conditional one-year reappointment, as originally proposed by the Credentials Committee.

## The Board's Decision

The Board met to consider the Hearing Committee's recommendation on February 8, 2000. Concluding that Dr. Freilich's behavior was not "remediable," the Board voted not to change its decision.[12] The next week, Dr. Freilich formally requested appellate review, as provided under Harford's bylaws.

Harford's Appellate Review Committee convened on March 16, 2000, hearing testimony from Dr. Freilich, Dr. Margaret Vaughan on behalf of the hospital, and legal counsel for both parties. The committee consisted of three non-physicians and one physician, who served as chairman. On March 30, the committee issued a report affirming the Board's decision not to reappoint Dr. Freilich. The report indicated that the primary reason for rejecting the MEC's recommended year of privileges with monitoring was that Dr. Freilich "lacked personal insight or understanding of the fact that she has caused multiple problems, which is a prerequisite to their remediabili-

---

**11.** There is no indication that the four physician Board members (of eleven members present) abstained from voting on this decision.

**12.** This time, three of the four physician Board members abstained from the vote.

ty." The Board met on April 11, 2000, and voted to affirm its decision. The four physician members of the Board abstained from this vote.

## Lawsuit

Dr. Freilich filed a complaint in the Circuit Court for Harford County, naming Upper Chesapeake, the Board, and individual members of the Board as defendants. She alleged breach of contract and misapplication of Harford's bylaws and sought damages and declaratory and injunctive relief.[13] After a hearing, the Circuit Court granted the defense motion for summary judgment on all counts, based on HCQIA immunity. The Circuit Court reasoned that, "when examined in its totality, the entire one year, nine month multi-step fact finding process satisfies the HCQIA's standard of objective reasonableness." Thus, it held that the defendants were "immune from any and all claims for money damages." [14] The Court of Special Appeals affirmed in an unreported opinion,[15] and Dr. Freilich filed a timely petition for *certiorari*, on the issue of HCQIA immunity, which we granted.

---

**13.** Dr. Freilich had previously filed a complaint in federal court, alleging that "the hospital and individual defendants ... violated her constitutional rights [under 42 U.S.C. § 1983] ... violat[ed] the Americans with Disabilities Act and the Federal Rehabilitation Act ... a host of State law claims," and "that the Health Care Quality Improvement Act (HCQIA) ... and the Maryland statute (Section 19–319(e)) ... and regulation section 10.07.01.24(E) of the Code of Maryland regulations ... are all unconstitutional." *Freilich v. Bd. of Dirs. of Upper Chesapeake Health, Inc.*, 142 F.Supp.2d 679, 682 (D.Md.2001). The U.S. District Court for the District of Maryland dismissed all of her claims, but "exercise[d] its discretion to dismiss the remaining state law claims without prejudice." *Id.* at 683. The U.S. Court of Appeals for the Fourth Circuit affirmed. *See Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205, 209 (4th Cir.2002).

**14.** As explained above in footnote 2, the Circuit Court dismissed Dr. Freilich's claims for declaratory and injunctive relief for reasons not before us.

**15.** The Court of Special Appeals remanded on the issue of declaratory relief, but that issue is not before us.

## DISCUSSION

■ Congress enacted HCQIA to encourage peer review and monitoring of physicians. *See* H.R.Rep. No. 99–903, at 2 (1986), *reprinted in* 1986 U.S.C.C.A.N. 6287, 6384 (observing that HCQIA's purpose is to "improve the quality of medical care by encouraging physicians to identify and discipline other physicians who are incompetent or who engage in unprofessional behavior"); *Bryan v. Holmes Regional Med. Ctr.*, 33 F.3d 1318, 1321 (11th Cir.1994) (same). Part of Congress' strategy was to provide qualified immunity for those who discipline ineffective physicians.[16] *See* 42 U.S.C. § 11111(a)(1). Thus, as we observed fifteen years ago, "HCQIA provides participants in peer review activities with qualified immunity from liability for monetary damages in suits brought by the physicians who were the subjects of these review activities." *Goodwich v. Sinai Hosp.*, 343 Md. 185, 196–97, 680 A.2d 1067, 1073 (1996).

To qualify for immunity, the disciplinary action must have been a "professional review action" that complied with the standards set forth in 42 U.S.C. § 11112(a).[17] Those standards are that the action was taken

---

**16.** HCQIA immunity applies to:

(A) the professional review body,

(B) any person acting as a member or staff to the body,

(C) any person under a contract or other formal agreement with the body, and

(D) any person who participates with or assists the body with respect to the action.

42 U.S.C. § 11111(a)(1).

**17.** "Professional review action" means

an action or recommendation of a professional review body which is taken or made in the conduct of professional review activity, which is based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients), and which affects (or may affect) adversely the clinical privileges, or membership in a professional society, of the physician. Such term includes a formal decision of a professional review body not to take an action or make a recommendation described in the previous sentence and also includes professional review activities relating to a professional review action. In

(1) in the reasonable belief that the action was in the furtherance of quality health care,

(2) after a reasonable effort to obtain the facts of the matter,

(3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and

(4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).

42 U.S.C. § 11112(a)(1)-(4).

The burden on the issue of immunity rests with the plaintiff, as immunity is presumed unless the plaintiff rebuts it "by a preponderance of the evidence." 42 U.S.C. § 11112(a) ("A professional review action shall be presumed to have met the ... standards necessary for [immunity] unless the presumption is rebutted by a preponderance of the evidence.").

A number of courts have observed that the presumption of immunity creates an "unusual" standard for summary judgment. As the U.S. Court of Appeals for the Eleventh Circuit observed,

[T]he rebuttable presumption ... creates an unusual summary judgment standard that can best be expressed as

---

this chapter, an action is not considered to be based on the competence or professional conduct of a physician if the action is primarily based on—

(A) the physician's association, or lack of association, with a professional society or association,

(B) the physician's fees or the physician's advertising or engaging in other competitive acts intended to solicit or retain business,

(C) the physician's participation in prepaid group health plans, salaried employment, or any other manner of delivering health services whether on a fee-for-service or other basis,

(D) a physician's association with, supervision of, delegation of authority to, support for, training of, or participation in a private group practice with, a member or members of a particular class of health care practitioner or professional, or

(E) any other matter that does not relate to the competence or professional conduct of a physician.

42 U.S.C. § 11151(9).

follows: "Might a reasonable jury, viewing the facts in the best light for [the plaintiff], conclude that he has shown, by a preponderance of the evidence, that the defendants' actions are outside the scope of § 11112(a)?" If not, the court should grant the defendant's motion. In a sense, the presumption language in HCQIA means that the plaintiff bears the burden of proving that the peer review process was *not* reasonable. (Citations omitted.)

*Bryan*, 33 F.3d at 1333; *see also Gordon v. Lewistown Hosp.*, 423 F.3d 184, 202 (3d Cir.2005) (holding that HCQIA's "presumption of immunity creates an unusual standard for reviewing summary judgment orders, as the plaintiff bears the burden of proving that the professional review process was not reasonable and thus did not meet the standard for immunity").

We explained this standard in *Goodwich:*

[T]he proper summary judgment standard in [a HCQIA] case is whether [the plaintiff] produced sufficient evidence of the existence of a genuine dispute as to the material fact of whether [the professional reviewer] was entitled to the qualified immunity prescribed by the HCQIA.

*Goodwich*, 343 Md. at 207, 680 A.2d at 1078.

Dr. Freilich claims that she has rebutted the presumption of immunity by presenting evidence that Harford retaliated against her for her reports of substandard care and attempts to improve the quality of care at the hospital. In her words,

Appellees are not entitled to HCQIA immunity because they failed to meet the HCQIA immunity requirements. Appellees failed to make a reasonable effort to obtain the facts, they did not act with the reasonable belief that their actions were warranted by the known facts, and they did not act with the reasonable belief that their actions were in furtherance of quality health care. Appellees' denial of Dr. Freilich's hospital privileges was in retaliation of Dr. Freilich's reporting of substandard care.

We understand her argument to be that evidence that some people might have complained about her with a retaliatory motive creates a material question of fact regarding whether

the hospital's actions met the standards for immunity set forth in HCQIA.

Harford responds that a retaliatory "subjective bad faith whistleblower animus [does not] magically generate[ ] a material fact dispute regarding the Hospital's entitlement to HCQIA immunity." Instead, Harford asserts, immunity under HCQIA is determined by an "objective reasonableness standard" entirely unrelated to subjective motivation, retaliatory or otherwise.[18]

■ Although we agree with Harford that the plaintiff bears the burden of showing a material fact dispute, we disagree with its theory that retaliatory animus by the hospital is entirely irrelevant to HCQIA immunity. As our cases indicate, the "objective reasonableness test" looks to the "totality of the circumstances" to determine whether a defendant has met the standards for immunity set forth in HCQIA. *Goodwich*, 343 Md. at 208, 213, 680 A.2d at 1079, 1081. Therefore, any evidence is relevant if it could lead a rational trier of fact to conclude that the immunity standards were not met. This includes evidence that retaliatory animus prevented the defendant from making "a reasonable effort to obtain the facts" or supplanted the required "reasonable belief" that the professional review action was "warranted by the facts" and "in the furtherance of quality health care." *See* 42 U.S.C. § 11112(a)(1)-(4). It also includes evidence that the action was "primarily based on . . . any . . . matter that does not relate to the competence or professional conduct of a physician," including retaliatory animus, because such an action is not a "professional review action" and therefore cannot qualify for immunity. *See* 42 U.S.C. § 11151(9).

■ Yet Dr. Freilich is incorrect to the extent that she argues her reports of substandard care to the hospital are sufficient, without evidence of retaliation, to rebut the pre-

---

**18.** Respondents assert that Dr. Freilich's "asserted bad faith whistleblower animus standard . . . conflicts with HCQIA's objective reasonableness standard."

sumption of immunity. Without any evidence of a connection between a professional review action and its allegedly illegitimate basis, courts cannot presume that one exists. *See, e.g., Chalal v. Nw. Med. Ctr., Inc.,* 147 F.Supp.2d 1160, 1172 (N.D.Ala.2000) (granting summary judgment because there was "no evidence on record to suggest that the Hospital did not act 'in the reasonable belief that the action was in the furtherance of quality health care[.]'" (quoting 42 U.S.C. 11112(a)(1))); *Egan v. Athol Mem. Hosp.,* 971 F.Supp. 37, 42–43 (D.Mass.1997) (granting summary judgment because the "Plaintiff ... presented no evidence that the professional review action ... was motivated by anything other than a reasonable belief that it would further quality health care").

Thus, retaliatory animus is neither the panacea that Dr. Freilich believes it to be nor entirely irrelevant as Harford maintains. Instead, evidence of retaliation is simply one of several factors to be considered when determining whether, in the totality of the circumstances, the professional review action satisfied the standards for immunity set forth in HCQIA. We next address the primary cases cited by the parties.

### Dr. Freilich's Cases

Dr. Freilich asserts that the relevant cases stand for the proposition that "material facts in dispute regarding the reporting of substandard medical care" prevent summary judgment on HCQIA immunity. The two cases upon which she principally relies, however, support our interpretation, not hers. *See Clark v. Columbia/HCA Info. Servs., Inc.,* 117 Nev. 468, 25 P.3d 215 (2001); *Ritten v. Lapeer Reg'l Med. Ctr.,* 611 F.Supp.2d 696, 720 (E.D.Mich.2009). *Clark* held that to overcome the presumption of immunity, the plaintiff must present evidence capable of showing "by a preponderance of the evidence that the [professional review action] was not based on a reasonable belief that it was in furtherance of quality health care." *Clark,* 25 P.3d at 222. *Clark* did not hold that a physician's reporting of substandard medical care, without more, staves off summary judgment against her on the immunity issue. *Id.*

In *Clark,* the plaintiff presented evidence showing that "the reason for his dismissal was his apparently good faith reporting of perceived improper hospital conduct to the appropriate outside agencies, or whistleblowing." *Id.* Indeed, in *Clark,* "the only findings the board made in support of its decision [were] related to Clark's external reporting." *Id.* at 223. Such direct evidence of retaliation could certainly have led a rational trier of fact to conclude that the hospital's action was not based on the furtherance of quality health care.

Here, on the other hand, there is no evidence that the Board's decision was based on impermissible factors. Dr. Freilich has produced evidence that some doctors and nurses may have filed sham complaints against her because of her reporting, but she has no evidence that those allegedly sham complaints served as the basis for the Board's decision. In this regard, we agree with the U.S. Court of Appeals for the Sixth Circuit, which held that "conclusory statements attacking individual items of evidence considered by the reviewers" cannot rebut the presumption of immunity under HCQIA. *Meyers v. Columbia/HCA Healthcare Corp.,* 341 F.3d 461, 469 (6th Cir.2003).[19]

Dr. Freilich's other primary case, *Ritten,* is readily distinguishable as well. The plaintiff in *Ritten* had direct evidence of retaliation sufficient to permit a rational trier of fact to conclude that the hospital "did not make [its] decision 'in the

---

**19.** Our holding is also consistent with cases in which we set forth a plaintiff's burden when faced with a defense motion for summary judgment under other totality of the circumstances tests. *See, e.g., Jones v. Mid–Atlantic Funding Co.,* 362 Md. 661, 681, 766 A.2d 617, 628 (2001) (holding that the plaintiff's burden at summary judgment in a case involving a "totality of the circumstances" test is whether the "facts put forth by petitioners ... examined in their totality and in the light most favorable to ... the nonmoving party ... might satisfy a trier of fact that the ... test was met[.]"); *see also Magee v. DanSources Tech. Servs.,* 137 Md.App. 527, 561–562, 769 A.2d 231, 251 (2001) (holding that for a plaintiff's evidence to "survive [the] 'totality of the circumstances' standard on summary judgment" in a claim for sexual harassment, it must be "sufficiently specific, severe, pervasive, and harmful" to allow the fact finder to "conclude that [it] was sufficient to establish" the violation alleged).

reasonable belief that the action was in furtherance of quality health care[.]'" *Ritten*, 611 F.Supp.2d at 720. As the court observed,

> [T]he record here features direct evidence of retaliation. . . . According to Plaintiff, [his supervisor] told him that 'if you don't transfer that patient out of here, you may lose your job.' Roughly three weeks later, [the supervisor] summarily suspended Plaintiff's staff privileges . . . thereby terminating his ability to practice at this hospital. (Citations omitted.)

*Id.* at 716–17. Here, Dr. Freilich has no such evidence.

In short, the cases cited by Dr. Freilich do not support her argument that *any* evidence of retaliatory complaints is sufficient to rebut the presumption of immunity. Rather, those cases are consistent with our holding that the presumption of immunity is not rebutted unless the plaintiff produces evidence that could lead a rational trier of fact to conclude, in the totality of the circumstances, that the professional review action did not meet the four-part test for immunity set forth in HCQIA.[20] This requires that she prove retaliation by the hospital in making its decision.

### Harford's Reliance on *Goodwich*

As we indicated earlier, we do not adopt Harford's proposed ban on retaliatory motivation evidence. Harford relies primarily on *Goodwich* to support its thesis that a hospital's motivation is irrelevant under HCQIA. It quotes a portion of that case in which we observed:

> Even if the second opinion requirement was initiated out of fear of litigation, rather than patient care concerns, neither evidence of that fact nor the inferences from such evidence rebuts the presumption of reasonableness the [professional review] action enjoys. This evidence may support an inference of bad faith on [the hospital's] part; however, as we have already pointed out, what is relevant here is the

---

**20.** Dr. Freilich also cites an unreported case that we will not address.

objective reasonableness of the hospital's actions, not its subjective intent or motivation.

*Goodwich*, 343 Md. at 208, 680 A.2d at 1079.

Although this selective quotation lends superficial support for Harford's position, our holding in *Goodwich* was more nuanced. In that case, the plaintiff argued that two letters from the chairman of the Obstetrics and Gynecology Department tended to prove that the hospital dismissed him because of a fear of litigation instead of a desire to further quality health care. *Id.* These letters, however, were not connected to the hospital's professional review action. As we explained,

> Dr. Goodwich's reliance on these two letters improperly focuses on what is more accurately characterized as the hospital's preliminary conduct, while failing to address the basis for [the hospital] taking the professional review action that it did; this focus does not address, not to mention rebut, the evidence that was before the [Medical Executive Committee] when it abridged Dr. Goodwich's hospital privileges.

*Id.* The letters were not relevant because they did not bear on the professional review action in question. Indeed, the letters were written five and two years prior to Dr. Goodwich's dismissal, which took place when the review body had more and different evidence before it. *Id.* This explains why we held that the evidence of "subjective intent or motivation" did not bear on the "objective reasonableness of the hospital's action" in that case. *Id.* We do not read *Goodwich* as standing for the proposition that evidence of improper motives is *always* irrelevant under HCQIA.

Indeed, we held in *Goodwich* that a hospital's action is not immune unless it was "undertaken in the reasonable *belief* that quality health care was being furthered." *Id.* at 208, 680 A.2d at 1078 (quoting *Imperial v. Suburban Hospital Ass'n, Inc.*, 37 F.3d 1026, 1030 (1994) (citing 42 U.S.C. § 11112(a))). The relevant inquiry, we said, is whether "the *basis* for ... the professional review action" was reasonable. *Id.* at 208, 680 A.2d at 1079. No standard that looks to a person's

"belief" and "basis" can exclude all evidence of improper motivation. In other words, the hospital or other entity must actually hold the belief *and* the basis for the belief must be reasonable. "[T]he standard is an objective one which looks to the totality of the circumstances [to determine whether] the action was objectively reasonable." *Id.* at 208, 680 A.2d at 1078. When retaliation was the "basis" of an action, a rational trier of fact could conclude that it was not preceded by a "reasonable effort to obtain the facts of the matter" or "undertaken in the reasonable belief" that it was "warranted by the facts" and "in furtherance of quality healthcare." *See* 42 U.S.C. § 11112(a)(1)-(4). In short, retaliation can be relevant to HCQIA immunity.

Another provision of the HCQIA statute also supports our conclusion above. Under § 11151(a), if the hospital's action was "primarily based on ... any ... matter that does not relate to the competence or professional conduct of a physician," then it is not a "professional review action" under 42 U.S.C. § 11151(9) and cannot qualify for immunity under HCQIA. 42 U.S.C. § 11111(a)(1). Therefore, actions primarily based on retaliatory animus cannot be immune, as they are "primarily based on [a] matter that does not relate to the competence or professional conduct of a physician." 42 U.S.C. § 11151(9).

### Totality of the Circumstances Standard and its Application

The lesson we take from *Goodwich* and several federal cases interpreting HCQIA is that evidence of retaliatory animus is one of many types of evidence that can contribute, in the totality of the circumstances, to a finding that an action did not meet the standards for immunity set forth in HCQIA. The existence of some evidence that complaints were made by a disciplined physician about substandard care at the hospital, or that certain hospital staff filed complaints to retaliate for complaints by the physician, is relevant, but will not always rebut the presumption of immunity. The presumption of immunity under HCQIA entitles a defendant to summary

judgment if and only if the plaintiff fails to present evidence that could lead a rational trier of fact to conclude, in the totality of the circumstances, that the action (1) failed to meet the standards for immunity set forth in 42 U.S.C. § 11112(a)(1)-(4) or (2) was not a "professional review action" as defined in 42 U.S.C. § 11151(9).

Such is the case here. Although Dr. Freilich has presented some evidence of retaliatory complaints by the staff, her effort to rebut the presumption of immunity fails because her "retaliatory" evidence is insufficient to permit a rational trier of fact to conclude that the *hospital's* refusal to renew her privileges failed to meet the standards for immunity set forth in HCQIA. This is because, although Dr. Freilich broadly alleges that all of the hospital's conduct was retaliatory, and she presents evidence that some of the staff complaints filed against her were retaliatory, she points to *no* evidence that retaliation had anything to do with the Board's decision to refuse her privileges. If all of the complaints made about Dr. Freilich were based on retaliation, or even if the majority of them were, we might view the case differently. But, as we said, she offered no evidence of retaliatory motive with respect to a large majority of the complaints.

Some of the complaints made about Dr. Freilich were specifically disputed by her. She disputed five complaints in a letter to Dr. Wohl, in response to his letter setting forth the complaints. She also disputed several complaints arising out of the dialysis unit in a memorandum to Dr. Nowakowski, head of Upper Chesapeake's Nephrology Division. Although we cannot confirm, from the record before us, whether the MEC ever made findings of fact as to exactly what happened with respect to these disputed complaints, such omission is not fatal to the Board's immunity because the sheer number of complaints, coming from such a variety of sources, is compelling. Dr. Freilich has not pointed to record evidence that she produced evidence tending to refute even half of these.[21] The

---

21. A Petitioner bears the burden to include in the record extract portions of the testimony or other evidence that support her appeal, and

picture emerges that, although each incident may not have happened exactly as the complainant portrayed it, Dr. Freilich conducts herself in a manner that causes offense to patients, nurses, other doctors, and other hospital personnel. A reasonable person on the Board, reviewing this large volume of complaints, could be persuaded that Dr. Freilich's conduct was detrimental to the quality of health care in the hospital because it was distracting, created emotional distress, and detracted from a teamwork approach to the care of patients. As Dr. Vaughan stated before the Appellate Review Committee,

> There has been a tremendous administrative and emotional burden associated with Dr. Freilich and her behavior. I personally have spent more time in six years with her and issues related to her than all of the other physicians in the medical staff combined from both hospitals and I dare say there are a number of staff members who would be able to say the same thing[.]
>
>     *    *    *
>
> [P]atients and family have been hurt by her attitude and her communication. The hospital and the physicians on the medical staff have been put at risk because of her behavior and lack of communication. She has created a tremendous

---

to identify the location of that evidence in the record. Without providing the Court with the key evidence used against her, and how she rebutted it, she cannot meet her burden of rebutting the presumption of immunity. *See* Maryland Rule 8–501(c) ("The record extract shall contain all parts of the record that are reasonably necessary for the determination of the questions presented by the appeal and any cross-appeal."); *see also Md. Reclamation Assocs., Inc. v. Harford County,* 414 Md. 1, 61 n. 13, 994 A.2d 842, 878 n. 13 (2010) ("[The Petitioner] has the responsibility to support its factual assertions by citing pages of the record extract."); *ACandS, Inc. v. Asner,* 344 Md. 155, 192, 686 A.2d 250, 268 (1996) ("[T]he appellate court has no duty independently to search through the record for error[.]"); *Pulte Home Corp. v. Parex, Inc.,* 174 Md.App. 681, 760–61, 923 A.2d 971, 1016 (2007) ("We decline to comb through the eight-volume, 3,876–page record extract to ascertain information that Parex should have provided[.]"). Although the hearings before the Hearing Committee were clearly important, Dr. Freilich only provided the Court with snippets of those hearings, which exclude the above-mentioned testimony.

administrative burden on me and many others and the hospital reputation has suffered irreparably in the community as a result of her and her behavior toward patients and family.

There is no evidence that Dr. Vaughan possessed a retaliatory motive in recounting her history of dealing with complaints against Petitioner.

A few incidents bear repeating, for they provide insight into the extent of Dr. Freilich's inability to conduct herself in a professional manner around the hospital. When a nurse suggested giving pain medication to an alcoholic with pancreatitis, Dr. Freilich allegedly said, "I want him to be miserable. He did this to himself." She also allegedly told a patient's daughter that the physicians who were treating her mother "were trying to kill her." She was alleged to breach patient confidentiality and privacy, publicly humiliate patients, and numerous other instances of what Dr. Robert Roca called "behavioral eccentricity."

As we mentioned, a highly significant incident of her unprofessional behavior relates to her lack of honesty, as revealed in her written application for reappointment at Harford. The application required her to state whether "any hospital ever suspended, diminished, revoked or failed to renew [her] privileges," and if so, to "provide a full statement of explanation." In an effort to discount her suspension from Fallston, she stated, "There were no witnesses or corroboration of any 'unprofessional behavior' on my part. In fact, the only witness, a patient of mine, completely supported my testimony."[22] This was patently false.

Indeed, the limited excerpts from the hearings at Fallston contained in the record show that there were at least three witnesses who testified against her. One of these was Dr. Vaughan, the senior vice-president for medical affairs, who also wrote a letter in response to Dr. Freilich's application, explaining that "a number of witnesses appeared and corrobo-

---

22. These statements were made in a letter attached to her application.

rated allegations of unprofessional behavior on [her] part."
The report of Fallston's Hearing Committee additionally notes
that "[t]he hearing was conducted over a three day period . . .
during which extensive testimony, documentary evidence, and
argument of counsel was received and considered." More-
over, the committee found that "[t]he oral testimony on behalf
of the Hospital was credible" and "the evidence showed that
the MEC actions were both reasonable and supported by
substantial evidence."

As we have recently held, a physician's dishonesty in official
applications is a serious matter for which discipline is appro-
priate:

> A physician's submission of false information . . . in license
> renewal applications impedes the Board's ability to make
> accurate determinations about a physician's continued fit-
> ness. . . . [F]alse information could form the basis upon
> which the Board renews or grants a license, potentially to
> an unfit applicant. The Board is entitled to expect truthful
> submissions[.]

*Kim v. Md. State Bd. of Physicians*, 423 Md. 523, 32 A.3d 30
(2011) (upholding the decision of the Maryland State Board of
Physicians to fine and suspend a physician who failed to
disclose on his renewal application that he had been sued for
malpractice). Dr. Freilich's excuse for the misstatement
about the witnesses was that she "thought witness meant
something like the witnesses who sign in a will." Yet Dr.
Freilich has produced nothing to show that the hearing(s) at
Fallston were devoid of evidence against her.

Additionally, the transcript of the hearing before the Appel-
late Review Committee provides evidence that Dr. Freilich
was untruthful during this phase of the investigation as well.
She testified that the signatures on a petition to reinstate her
were of her patients, only to admit under cross-examination
that some of the signatures she obtained were of other people.
She also testified that she "was never told [her] behavior was
inappropriate," even though she had met numerous times with

the MEC and the Hearing Committee to discuss her unprofessional behavior.

Her appellate brief paints a misleading picture of the various committees who reviewed her conduct. She states: "Despite the reappointment recommendations by 1) the Credentials Committee of UCHS' Medical Staff, 2) The Medical Executive Committee (MEC), and 3) the Ad Hoc Hearing Committee ... each a committee of medical doctors, Appellee's lay board improperly and wrongfully terminated Appellant's HMH hospital privileges." Yet these committees did not cleanly recommend that she be reappointed. They recommended a conditional one-year reappointment during which she would receive counseling and be monitored for professionalism and behavior issues, and would have the opportunity, in the words of the Hearing Committee, "to prove her willingness to adjust her style and methods of operation to accommodate the hospital's legitimate concerns relating to her interactions with hospital staff and patients." [23] What is more, although the MEC initially recommended a one-year conditional reappointment, it ultimately recommended, after Dr. Wohl's committee completed its investigation and reported its findings, that Dr. Freilich not be reappointed at all. Thus, rather than supporting her cause of action, the recommendations of these committees lend credence to the Board's ultimate refusal to renew her privileges.

Dr. Freilich also scored considerably worse than her colleagues on a patient satisfaction survey. No physician had more than one patient choose "dissatisfied" or "somewhat dissatisfied" except Dr. Freilich, who had nine patients (out of 22) choose one of those options. Indeed, as we indicated earlier, the hospital received thirty-three complaints from patients about Dr. Freilich.

At the very end of Harford's three-year investigation, which involved numerous hearings by various hospital committees,

---

**23.** Later in her brief, she clarifies that these recommendations were for one year.

the Appellate Review Committee decided to uphold the decision to dismiss her because its report concluded, based on all the evidence, that her behavioral problems were "not remediable." It relied primarily on her apparent unwillingness to admit or remedy her behavior problems:

> Given the long history of the problems Dr. Freilich has created with her attitude and behavior, and given the fact that she has acquiesced to the idea of seeking some form of professional help, both at Fallston General Hospital and Harford Memorial Hospital, only when her privileges were directly threatened, the committee concludes that there is a strong reason to believe that the problems are not remediable.

Especially telling for the committee was her unwillingness to forthrightly address her problems, even at the final stage of the review process before the Hearing Committee:

> A review of her testimony before the Ad Hoc Hearing Committee, particularly with respect to her exhibit which she represented to be a petition from her patients when in fact she knew it contained multiple signatures of people who were not her patients, was less than forthright.
>
> Her evasive testimony about whether she had been counseled about her behavior and her testimony regarding her behavioral problems at other institutions was also less than forthright. Her testimony regarding the lack of counseling was of particular concern given the significant amount of documented counseling she had received over many years.

The report of the Appellate Review Committee also highlighted Dr. Freilich's lack of self-awareness, even after all the complaints against her:

> [Although there] is ample evidence in the record that Dr. Freilich's demeanor and attitude has led to problems with patients and their families far beyond those experienced by any other physician on the Medical Staff ... [she] clearly lacked personal insight or understanding of the fact that she has caused multiple problems, which is a prerequisite to their remediability. She decidedly refused to accept any

significant degree of personal responsibility for or ownership of the multiple and varied confrontations, conflicts, and problems which have been clearly documented to have involved her via her actions and statements to patients, families, and staff at Harford Memorial Hospital.[24]

It is clear that the hospital ultimately declined to renew Dr. Freilich's privileges because it concluded that she had no capacity to recognize that her conduct was unduly disruptive to hospital operations, and that one more year of monitoring her, with hopes of change, was futile. The Board legitimately perceived that Dr. Freilich was not going to remedy her disruptive behavior. There is nothing in the record to indicate that she was dismissed in retaliation for her complaints about substandard care.[25]

We return to the standard for summary judgment under HCQIA. Summary judgment for the defense may be granted if the plaintiff has failed to present evidence that could lead a rational trier of fact to conclude, in the totality of the circumstances, that the action (1) failed to meet the standards for immunity set forth in 42 U.S.C. § 11112(a)(1)-(4) or (2) was not a "professional review action" as defined in 42 U.S.C. § 11151(9). As a shorthand summary, the defendants have immunity under Section 11112(a)(1)-(4) if (1) they reasonably believed they were furthering quality health care; (2) made a reasonable effort to obtain the facts; (3) held adequate hearings; and (4) reasonably believed action was warranted by the facts. As for (1) and (2), undeniably, the hospital investigated Dr. Freilich's conduct for over two years, holding at least twelve hearings, and the investigation garnered enough evidence to support a reasonable belief that Dr. Freilich disrupt-

---

24. The minutes of the February 8, 2000, Board meeting, at which the Board voted not to reappoint Dr. Freilich, also indicate that the primary basis for its decision was its conclusion that Dr. Freilich's behavior was not "remediable."

25. Even if the Board, in making its decision, reviewed some complaints against Dr. Freilich that were filed with retaliatory animus, there is no evidence that those complaints formed the basis of its decision.

ed hospital caregivers with her unprofessional conduct. Moreover, Dr. Freilich provided no evidence that the Board did not act "in the reasonable belief that the action was in the furtherance of quality health care[.]" There is simply no evidence that the Board did not act in good faith.

Nor has Dr. Freilich presented evidence capable of showing that the Board failed to make a "reasonable effort to obtain the facts." She argues that by failing to consider her reporting of substandard care, the Board demonstrated "a deliberate ignorance of those important facts." Yet there is no indication that those facts were "important," as they did not serve as the basis for the Board's decision. The Board had plenty of evidence supporting its decision to dismiss her based solely on the non-retaliatory complaints, her application for renewal, and her testimony during the investigation and hearings.

We decline to hold that simply because a physician can point to instances where hospital personnel, such as nurses, may have filed complaints against the physician in retaliation for the physician's complaints about substandard care, which complaints are included in evidence considered by the disciplinary body, the physician's claim survives the hospital's summary judgment motion under HCQIA—no matter how bad the physician's *other* conduct may be. Such a holding would unfairly undermine the protections offered by HCQIA, and unduly handcuff peers and hospital administrators who must assess complicated fact situations in the course of peer review or disciplinary action. In sum, although Dr. Freilich alleges retaliation generally, she has not connected it to the Board's decision to terminate her privileges. Thus, she has not produced evidence sufficient to convince a rational trier of fact that Harford failed to satisfy the standards for immunity set forth in HCQIA. Summary judgment is warranted.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONER.**