*Barkha Gurbani v. Johns Hopkins Health Systems Corp., et al.*, No. 1825, September Term 2016. Opinion by Arthur, J.

**EDUCATION – BREACH OF CONTRACT OR NEGLIGENCE IN ACADEMIC DECISIONS**

In *Hunter v. Board of Education of Montgomery County*, 292 Md. 481 (1982), the Court of Appeals established a policy of declining to entertain actions for either negligence or breach of contract based on an allegation that an educator improperly evaluated a student. The Court declared that "an award of money damages" is "a singularly inappropriate remedy for asserted errors in the educational process." *Id.* at 487. Although *Hunter* concerned a minor child enrolled in public school, *Hunter* is only a single example of a deep collection of case law that overwhelmingly favors judicial noninterference with academic decisions at all levels of education. Generally, courts may not override an academic decision unless it is such a substantial departure from accepted academic norms that the decision maker did not actually exercise professional judgment.

A private medical school's decision to dismiss a surgical resident based on unfavorable assessments of the resident's clinical performance is an academic decision that is entitled to deference. In this case, a former resident's assertions that the University faculty incorrectly assessed her performance could not serve as the basis for a breach-of-contract claim seeking to recover damages resulting from the allegedly improper dismissal.

Moreover, courts will not entertain contract claims that in fact attack the quality of educational services. The resident's assertions that the University performed certain educational services, but did so inadequately, could not serve as the basis for a breach-of-contract claim.

Although the resident produced some evidence that the University arguably may have failed to fulfill a few identifiable contractual provisions, those arguable breaches could not serve as the basis for an award of damages resulting from the academic dismissal. Any relationship between the arguable procedural failures and the academic dismissal was too speculative and subject to too many future variables to establish that the alleged breaches caused the alleged damages.

Maryland's policy against entertaining actions for negligent education also precludes a claim alleging that an educational institution negligently retained and supervised faculty members who allegedly made improper student evaluations.

**SUMMARY JUDGMENT – EVIDENCE OF BAD FAITH**

Where a plaintiff alleges that a defendant acted in bad faith, the defendant is entitled to summary judgment absent a showing, supported by particular facts, shown in detail and

with precision, sufficient to allow a fact finder to conclude that the defendant lacked good faith. The plaintiff here failed to produce sufficient evidence of bad faith by the defendants.

In this case, a dismissed medical resident alleged that certain educators acted in bad faith when they gave unfavorable evaluations of her performance. The resident lacked any direct evidence of animus. Her mere characterizations of supposed hidden motives of her evaluators was insufficient as evidence of bad faith. Although the resident theorized that two evaluators may have had some motive to retaliate against her after she complained about their conduct, the evidence failed to demonstrate the necessary connection between the alleged retaliatory motive and the actions that it allegedly motivated. The resident's testimony was neither detailed nor precise enough to permit the conclusion that her complaints about her evaluators predated their unfavorable assessments of her performance. Moreover, the challenged assessments were fully consistent with the independent assessments of other medical professionals who observed the resident around the same time.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1825

September Term, 2016

_____

BARKHA GURBANI

v.

JOHNS HOPKINS HEALTH SYSTEMS
CORP., *et al.*

_____

Wright,
Arthur,
Albright, Anne K.
     (Specially Assigned),

JJ.*

_____

Opinion by Arthur, J.

_____

Filed: June 1, 2018

* Judge Matthew J. Fader did not participate in
the Court's decision to designate this opinion
for publication pursuant to Md. Rule 8-605.1.

In this case, a physician brought an action seeking damages resulting from her academic dismissal from an orthopaedic surgery residency program at the Johns Hopkins University School of Medicine. After extensive discovery and briefing, the Circuit Court for Baltimore City entered summary judgment against the physician on all of her claims. We affirm, primarily because of the principle that courts must defer to good-faith academic decisions concerning promotion and dismissal.

**FACTUAL AND PROCEDURAL BACKGROUND**

Appellant Barkha Gurbani, M.D., makes allegations that concern multiple years of her graduate medical education. In connection with the summary judgment motion, the parties submitted transcripts from dozens of depositions, as well as a deluge of evaluations, memos, and emails relating to the residency.

Dr. Gurbani seeks to prove that she was improperly dismissed because the program failed to live up to its end of the residency contracts or because of deliberate actions by two faculty members and the program director. The defendants assert that Dr. Gurbani failed to advance because of her numerous, well-documented deficiencies as a surgical resident, and they contend that the decisions of the University faculty should not be second-guessed through a jury trial.

Three main principles guide our examination of this voluminous record. In an appeal from the grant of a defendant's motion for summary judgment, we review the facts and all inferences drawn from those facts in the light most favorable to the plaintiff. *See, e.g.*, *Jackson v. Dackman Co.*, 422 Md. 357, 370 (2011). The inferences drawn in favor of the plaintiff, however, "must be *reasonable* ones." *Clea v. Mayor & City*

*Council of Baltimore*, 312 Md. 662, 678 (1988) (emphasis in original). Furthermore, a dispute of fact, in itself, will not prevent the entry of summary judgment; rather a court is precluded from entering summary judgment only when the record reveals a genuine dispute of a *material* fact. *See, e.g.*, *Castruccio v. Estate of Castruccio*, 456 Md. 1, 34 (2017).

### A.  Dr. Gurbani's Path to the Residency Program at Johns Hopkins

Barkha Gurbani earned a bachelor's degree from Johns Hopkins University in 2004 and a medical degree from the University of California, Los Angeles, in 2009. During her fourth year of medical school, she took an elective course in the pediatric orthopaedics department at Johns Hopkins. At that time, the Johns Hopkins faculty rated her performance as "outstanding" in all categories. Because Dr. Gurbani aspired to become an orthopaedic surgeon, she pursued a residency in that field.

A residency is a form of education structured so that a medical school graduate can develop into an independent practitioner in a particular specialty. *See* Accreditation Council for Graduate Medical Education (ACGME), Glossary of Terms, at 5, 8 (2013), https://www.acgme.org/Portals/0/PDFs/ab_ACGMEglossary.pdf. Residencies in orthopaedic surgery last for five years. ACGME Program Requirements for Graduate Medical Education in Orthopaedic Surgery, at 1 (2017), https://www.acgme.org/Portals/0/PFAssets/ProgramRequirements/260_OrthopaedicSurgery_2017-07-01.pdf. The first-year curriculum focuses on basic surgical skills, and the curriculum for the remaining four years is more specialized in orthopaedics. *Id.* at 16-17.

A medical residency is a "physically, emotionally, and intellectually demanding"

2

experience which "requires longitudinally-concentrated efforts on the part of the resident." *Id.* at 1. Residents develop through a combination of "didactic" and "clinical" experiences. *Id.* at 3. In regular didactic sessions, residents receive formal instruction to increase their knowledge and understanding of medicine. *Id.* at 11. Most of a resident's education occurs in the clinical setting, "within the context of the health care delivery system." *Id.* at 1. The resident participates directly in patient care under the guidance and supervision of the attending physicians on the program faculty. *Id.* Over time, as the resident demonstrates growth, the attending physicians delegate to the resident a progressively larger share of the responsibility for patient care. *Id.* at 28. The faculty members also evaluate the resident's progress and advise the program director on decisions such as the promotion, remediation, or dismissal of a resident. *Id.* at 20.

In July 2009, Dr. Gurbani started a residency in orthopaedic surgery at the University of Pennsylvania. She was placed on probation at the end of her first postgraduate year. She was reinstated as a resident in good standing as of November 2010, at which point she left that program. In a letter protesting the probation, she acknowledged that "the decision to place [her] on probation was based on [her] performance for [her] entire" first postgraduate year. In the present litigation, Dr. Gurbani seeks to characterize that probation as "nonacademic."[1]

---

[1] The record includes a copy of a letter that Dr. Gurbani wrote in August 2010 to protest her probation at the University of Pennsylvania. Dr. Gurbani acknowledged that the "primary motivating factor" for the decision was her failure to change her "personal behavior toward hospital staff." She further acknowledged that a number of other issues (reporting requirements, interactions with other residents, call coverage protocol, and one poor course evaluation) contributed to the decision. Presaging some of the events in this

Dr. Dawn LaPorte, director of the orthopaedic surgery residency program at Johns Hopkins University School of Medicine, spoke with Dr. Gurbani while she was serving out her probation. The University of Pennsylvania disclosed in writing that, although Dr. Gurbani had satisfied the requirements of the first year of her residency, she had been subject to "disciplinary action in the form of probation[.]" Although Dr. LaPorte knew about the probation, she invited Dr. Gurbani to transfer to Johns Hopkins.

Along with the transfer, Dr. Gurbani registered with the Maryland Board of Physicians as an unlicensed practitioner. On her application, she answered "No" to a question that asked whether she had ever been "placed on probation . . . while in a postgraduate residency training program[.]" Dr. Gurbani claims that Dr. LaPorte had advised her that she should not disclose her previous probation to the Board of Physicians. Dr. LaPorte denies that she ever advised Dr. Gurbani in that way. When Dr. Gurbani renewed her registration in the following year (without consulting with Dr. LaPorte), she again represented to the Board of Physicians that she had never been on probation during a residency.

**B.      The Initial Resident Contract: July 2011 through June 2012**

On July 1, 2011, Dr. Gurbani entered into a one-year contract with Johns Hopkins University through its School of Medicine. Under the contract, she was appointed as a second-year postgraduate resident in the five-year program in orthopaedic surgery. The contract required her to provide clinical services at Johns Hopkins medical facilities in

---

case, Dr. Gurbani disputed reports about her conduct and accused colleagues of unprofessional behavior.

exchange for a stipend, liability insurance, and other benefits.

The residency contract covered both employment and educational services. It required Dr. Gurbani to "[f]ulfill the educational requirements of the Program." It required the University to provide "appropriate and adequate faculty and Medical Staff supervision for all educational and clinical activities." It stated that the program director and faculty would "[e]valuate" Dr. Gurbani's "educational and professional progress and achievement . . . on a regular and periodic basis."

The contract authorized the program director, Dr. LaPorte, to take "corrective action" under the University's general policy for probation, suspension, and termination if she deemed Dr. Gurbani's performance to be deficient. It required the University to "[p]rovide a mechanism to fairly deal with academic or disciplinary actions" through the University's general grievance policy. The contract included a list of references to those written policies, which were available to Dr. Gurbani through the University's website.

The University expressly disclaimed any commitment to promote Dr. Gurbani at the end of the one-year term. The contract stated: "Reappointment and/or promotion to the next level of training is in the sole discretion of the Program Director and is expressly contingent on several factors, including . . . satisfactory completion of all training components, [and] satisfactory performance evaluations[.]" The contract required the University to give written notice at least four months before the end of the term in the event that it might decline to renew the appointment. But if the "primary reason" for the nonrenewal occurred within those last four months, the contract required written notice as far in advance "as the circumstances w[ould] reasonably allow."

5

The contract stated that, although the parties anticipated that the appointment would continue for the one-year term, the University could terminate the contract at any time on the grounds specified in the contract. The contract identified a resident's failure to satisfy educational or professional responsibilities as a ground for termination. The contract permitted Dr. Gurbani to pursue a grievance with the University in the event of non-renewal of her appointment or termination from the program.

## C.     Assessments from Dr. Gurbani's First Three Rotations

Beginning in July 2011, Dr. Gurbani progressed through a series of rotations focusing on different aspects of orthopaedic medicine at Johns Hopkins. Each rotation lasted for about 10 weeks. Her first rotation was at the Bayview Medical Center, her second was on the Hopkins spine service, and her third was in sports medicine.

Members of the program faculty completed formal evaluations. On mid-rotation evaluations, faculty members used a scale of 1 to 3 to assess whether a resident was meeting expectations in different areas. On end-rotation evaluations, faculty members used a scale of 1 to 5 to assess how often a resident achieved different standards. Other medical professionals who worked with Dr. Gurbani also submitted evaluations in which they rated her performance from poor to excellent in various categories. All types of evaluations included a space for written comments. Once a formal evaluation was submitted, Dr. Gurbani had access to the scores and the comments.

In early evaluations, faculty members commented that Dr. Gurbani needed to improve "her surgical skills" and that she needed to "continue to read to increase [her] fund of knowledge." Overall, however, the faculty praised her performance from the first

6

two rotations and noted that she was working hard to improve.

The faculty members did not always submit their evaluations promptly. For instance, one faculty member submitted a highly positive evaluation of Dr. Gurbani's performance on the Hopkins spine service over five months after that rotation ended.

Meanwhile, Dr. Gurbani scored in the 38th percentile among second-year postgraduate students on the Orthopaedic In-Training Examination (OITE), a standardized assessment of a resident's knowledge of orthopaedics. By all accounts, her score was adequate relative to other residents in the program.

Throughout the academic year, the attending physicians regularly discussed Dr. Gurbani's performance at faculty meetings. Dr. LaPorte documented those meetings by taking notes that her assistant would later transcribe into a separate electronic document for each meeting. In those memos, Dr. LaPorte recorded the various concerns that faculty members expressed about Dr. Gurbani's progress. For instance, the memo from a September 2011 meeting states that one doctor had raised "concerns regarding professionalism and effective communication" in her care of pediatric patients. The memo from an October 2011 meeting states that one doctor described her as "behind the curve," another commented that she "need[ed] to work on" her surgical skills, and another observed that she would "get[] overwhelmed very quickly" and had "difficulty with simple tasks," such as applying casts.

In this appeal, Dr. Gurbani relies on those memos to establish certain facts, but she also appears to contend that the criticisms from these memos should be discounted. She accuses University officials of fabricating the faculty comments long after they decided

7

to dismiss her, but she points to nothing in the record that would support her accusation.[2]
In any event, other unchallenged testimony shows that multiple faculty members voiced increasing concerns throughout the academic year. In the words of one faculty member, "as the responsibilities and expectations increased, . . . there were greater concerns expressed that she wasn't meeting expectations."

Dr. Gurbani began to encounter more serious difficulty after she advanced to the sports medicine rotation in November 2011. In his mid-rotation evaluation, Dr. Andrew Cosgarea determined that Dr. Gurbani was not meeting expectations for basic knowledge of the rotation, critical thinking, and surgical skills. Dr. Cosgarea commented that she needed "to be better prepared in the operating room by reading about the surgical procedures and reviewing anatomy." In his end-rotation evaluation, he commented that, even though he had advised her about ways to improve, he still considered "her surgical skills and understanding of anatomy to be below average." Dr. Cosgarea gave her a score of 2 out of 5 in the "Technically Competent" category, meaning that he observed that she was "technically competent to perform surgical procedures consistent with [her] level of training" about 20 percent to 39 percent of the time.

### D. The Semiannual Evaluation Meeting: January 26, 2012

The contract specified that the program director would "present to and discuss with the Resident a written summary of the evaluations at least once during each six

---

[2] In one sentence of her brief, Dr. Gurbani asserts that the meeting notes are "not contemporaneous" and "shown to be edited" by the associate dean of graduate medical education. The pages of the record extract that she cites in no way support that assertion.

8

month period of training[.]" Dr. LaPorte met with Dr. Gurbani for their semiannual evaluation meeting on January 26, 2012, shortly before the end of the sports medicine rotation.

According to Dr. LaPorte, their conversation was "based on all of [the] written evaluations," which she "had in front of [her]" during the meeting. Dr. LaPorte prepared a memo titled "Resident Semi-Annual Evaluation," which included quotations from those evaluations. In her memo, Dr. LaPorte wrote that she informed Dr. Gurbani about concerns that faculty members had expressed about her "technical skills and a lack of progression in the operating room." Dr. LaPorte wrote that they "discussed the critical importance of making a true effort to improve her technical skills as well as her comfort in the operating room and her knowledge base and to work on increasing her confidence with good board presentations and ability to make decisions as appropriate."

Dr. Gurbani did not receive a copy of that memo. She denies that Dr. LaPorte expressed any concern about her progress or discussed any need for improvement. According to Dr. Gurbani, Dr. LaPorte told her that she was "in the middle of [her] class" based on her exam score, that she was "meeting all the core competencies," and that her performance was "completely acceptable" for her level of training. Dr. Gurbani claims that Dr. LaPorte specifically told her "not to worry" about her low scores in the sports medicine rotation because "Dr. Cosgarea had been known as a harsh evaluator."

E.      **Evaluations from the Pediatric Orthopaedics Rotation**

In February 2012, Dr. Gurbani advanced to the pediatric orthopaedics rotation. The head of that division, Dr. Paul Sponseller, determined on his mid-rotation evaluation

9

that Dr. Gurbani was meeting expectations, but he commented that she had "some challenges in prioritizing her work" and that "her motor skills [we]re not yet intuitive." In his end-rotation evaluation, Dr. Sponseller commented that Dr. Gurbani still needed "to develop more confidence in her own decisions and skills," but that she had "made progress" in that direction. Dr. Sponseller observed that she was capable of adequate preoperative planning and technically competent in surgical procedures about 40 percent to 79 percent of the time. At his deposition, Dr. Sponseller explained that his evaluation did not mean that she had failed the rotation outright, but that her scores in those categories were "cause for concern."

Two other faculty members, Dr. John Tis and Dr. Michael Ain, had less favorable impressions of Dr. Gurbani's performance on the pediatric orthopaedics rotation. They submitted their formal evaluations within the academic year, but several weeks after the rotation ended in mid-April 2012. Dr. Tis submitted a "mid-rotation" evaluation on May 11, 2012, in which he stated that Dr. Gurbani's critical thinking and documentation skills did not meet expectations. Dr. Tis commented that Dr. Gurbani had "[d]ocumented incorrect exam results" and that she needed "to slow down and concentrate on what she is doing."[3] In a final evaluation, submitted in June 2012, Dr. Tis gave her scores of 2 out of 5 or below in seven categories.

Dr. Ain submitted two evaluations in early June 2012. His "mid-rotation"

---

[3] By the time of his deposition, several years later, Dr. Tis could not recall details about the documentation error, but remembered that he considered her error to be "a red flag."

10

evaluation stated that Dr. Gurbani was not meeting expectations in any area. He commented that she needed to improve her "responsibility," "basic knowledge," "operative ability," and "following up." In his end-rotation evaluation, he gave Dr. Gurbani scores of 1, 2, or 3 out of 5 in every category. He commented that he had "talked to her on several occasions about the care that she gives" and that he had "offered suggestions," but Dr. Gurbani showed "no signs of improvement" and failed even to "recognize that she gives truly poor care."

In a memo from May 4, 2012, Dr. LaPorte recorded that, when she told Dr. Gurbani that the pediatric orthopaedics faculty voiced concern "that she would frequently miss important points in patient evaluation and patient care," Dr. Gurbani responded by claiming that "much of th[o]se issues were 'misunderstandings' and that it 'was not truly her fault.'" The memo also states that Dr. Gurbani complained that she "did not feel that it was appropriate for Dr. Ain to evaluate her" because she had worked with him only "occasionally on call." Dr. Gurbani now maintains that she "actually never worked" with Dr. Ain and that he evaluated her performance on the rotation "without ever directly observing" her. She has not disputed that Dr. Tis observed her.

F.     **Orthopaedic Trauma Rotation with Dr. Osgood and Dr. Hasenboehler**

By mid-April 2012, Dr. Gurbani had moved on to the orthopaedic trauma service for the final rotation of the academic year. She worked primarily with Dr. Greg Osgood and with Dr. Erik Hasenboehler, the two faculty members whom she would later name as defendants in her lawsuit (alongside the program director, Dr. LaPorte).

Sometime around early May of 2012, Dr. Gurbani complained orally to Dr.

11

LaPorte about the way she was being treated on the trauma rotation. Dr. Gurbani claims that she reported several instances of sexist or inappropriate behavior by the two attending physicians. Dr. Gurbani does not remember exactly when she made particular reports, except to say that she started complaining "very early" in the rotation and then continued to make "many, many" complaints throughout the rotation.[4]

Dr. Gurbani says that Dr. Osgood displayed a calendar in the operating room that featured the musical artist Taylor Swift in "provocative" poses. Dr. Gurbani says that some music that Dr. Osgood played in the operating room was "obscene" because the lyrics "basically allud[ed] to oral sex." Dr. Gurbani says that Dr. Osgood repeatedly made innuendo while discussing procedures involving male genitalia.[5]

Dr. Gurbani says that, once while she was present in a clinic, Dr. Hasenboehler passed around a phone to other residents to show them photos of himself "taking body shots" off of a female "stripper" at his birthday party. Dr. Gurbani also says that Dr. Hasenboehler called her "a girl" and told her that she "had to work 350 times harder because [she] was a female." Although female colleagues sometimes told her that she would need "to work twice as hard to be considered half as smart in [a] male dominated

---

[4] In her brief, Dr. Gurbani asserts that she documented her complaints about the conduct of Dr. Osgood and Dr. Hasenboehler "in contemporaneous notes." She points to nothing from the record that would support her assertion.

[5] In his deposition, Dr. Osgood admitted that he displayed a Taylor Swift calendar but he denied that it was "suggestive." Dr. Osgood admitted that he sometimes selected music in the operating room, but said that he would always change the selection whenever anyone asked him to do so. He also admitted that in "rare moment[s]," he would "say something with innuendo" but that was "about as far" as he would go.

field[,]" Dr. Gurbani felt that Dr. Hasenboehler's comment was inappropriate in light of his other behavior.

Both Dr. LaPorte's memos and a "timeline" produced by Dr. Gurbani, show that their first meeting during the rotation occurred on May 4, 2012.[6] Dr. LaPorte's memo states that, "[p]rior to [the] meeting," she had already "spoken with Dr. Osgood and Dr. Hasenboehler, both of whom had some concerns regarding [Dr. Gurbani's] ability to evaluate patients and make decisions." The memo mentions that Dr. Gurbani complained about Dr. Ain's evaluations and about her conflicts with the senior resident from the orthopaedic trauma service, but it does not mention that Dr. Gurbani complained about either of the two attending physicians.

According to Dr. LaPorte's testimony, Dr. Gurbani did not report instances of "misconduct" at the meeting on May 4, 2012, but she expressed a more general belief that she was being treated "unfairly" or "differently" from other residents. Dr. LaPorte says that she investigated the situation by speaking to the senior resident, who opined that Dr. Gurbani was being treated like any other junior resident. Dr. LaPorte says that she also sought more information from Dr. Osgood, who explained that he had been limiting Dr. Gurbani's time in the operating room so that she could focus on improving her basic knowledge of patients and diagnoses.

According to Dr. Osgood's testimony, he was not aware during the rotation that

---

[6] Dr. Gurbani's timeline shows that she requested a meeting on April 20, 2012, but Dr. LaPorte was unavailable at the time. Her timeline also shows that she interacted with Dr. LaPorte on April 29, 2012, but "no issues[] were brought up" at that time.

13

Dr. Gurbani had made allegations about mistreatment. Similarly, there is no evidence indicating that Dr. Hasenboehler was made aware of complaints against him at that time.

At some point during the rotation, an operating room nurse independently reported to Dr. LaPorte that "Dr. Gurbani had a rough day in the OR and the trauma faculty were tough on her." Dr. LaPorte says that, in response, she "tried to reassure [Dr. Gurbani] and tell her to hang in there." Around this time, other colleagues reported that Dr. Osgood would have occasional outbursts of anger in the operating room. Those reports prompted the chair of the orthopaedic surgery department to warn Dr. Osgood in the summer of 2012 that he needed to improve his self-control.

## G.  The Decision to Place Dr. Gurbani on Academic Probation

The faculty met on May 24, 2012, to evaluate Dr. Gurbani's progress as she approached the end of the academic year. The memo for that meeting states that eight doctors expressed concerns about Dr. Gurbani's performance: Dr. Osgood noted that she "frequently w[ould] miss a diagnosis" and did not "see the gravity of missing important points in patient care," and he had not observed "any improvement" after he tried to give her time to "focus on the basics" outside the operating room; Dr. Hasenboehler, Dr. Ain, and Dr. Cosgarea each expressed doubts about whether she could complete the residency program; two other doctors expressed disappointment with her contributions to a research proposal; another doctor reported instances of her poor communication in the pediatric emergency department; and another doctor reported that she had missed a diagnosis of

14

"pediatric compartment syndrome."[7]  Dr. LaPorte concluded: "If she does not wish to

consider changing specialties and does not show improvement during the trauma rotation,

I will likely need to put her on probation."

One week later, Dr. LaPorte informed Dr. Gurbani that the faculty had serious

concerns about her future in the program and asked her to consider another specialty.  At

their next meeting, another week later, Dr. LaPorte presented two options.  The first

option was to resign, which Dr. Gurbani refused to do.  The second option was to repeat

another year at the second-year postgraduate level, beginning with a four-month

probation period, after which the faculty would decide whether she could continue in the

program.  In her memo, Dr. LaPorte wrote: "She does understand that when she leaves

the office today I will be officially putting her on probation."

Dr. Gurbani claims that, during that meeting, she requested an "appeal or some

type of formal grievance" regarding her probation.[8]  Dr. LaPorte told Dr. Gurbani that

she could seek an "informal appeal" by asking the attending physicians to reconsider

their evaluations.  Dr. Gurbani says that she "tried to reach" Dr. Osgood and Dr.

Hasenboehler, but that they did not respond.

In that process, Dr. Gurbani communicated with Dr. Tis, who had given her poor

---

[7] In his deposition, the doctor could not recall details about that incident.  He explained that a compartment syndrome is a "true pediatric emergenc[y]" because the failure to diagnose it could result in "loss of a limb."

[8] The University's policy documents appear to use the term "appeal" to include both an informal request for faculty members to reconsider a decision and a formal grievance heard by an appointed panel.

evaluations from the earlier rotation in pediatric orthopaedics. Dr. Tis emailed Dr. LaPorte to explain that he had an "extensive discussion" with Dr. Gurbani about "her lack of progression in the program." Dr. Tis wrote that she "seems to have some difficulty realizing what her shortcomings are, specifically difficulty applying basic knowledge to clinical situations such as assessment of the patient, initiation of basic orthopaedic care in the [emergency department], and communication of this assessment with her seniors." Although Dr. Gurbani received a copy of the email, she claims that Dr. Tis never spoke with her about any of her shortcomings.

Dr. LaPorte informed Dr. Gurbani that she could challenge the probation decision through Dr. Julia McMillan, the associate dean of graduate medical education. According to Dr. Gurbani, Dr. McMillan told her "that [Dr. Gurbani's] department was refusing [her] the ability to appeal" the probation decision.[9]

On June 14, 2012, Dr. Gurbani learned that Dr. LaPorte had announced in front of the entire residency class that she had been placed on academic probation. Dr. Gurbani asserts that this announcement violated the University's records-retention policy, which states that a resident's "Evaluative File is confidential and will be kept in a secure location."

As Dr. Gurbani completed the final weeks of the orthopaedic trauma rotation, Dr. Osgood had not yet submitted either of his written evaluations. On or after June 15,

_____

[9] Although her deposition testimony was vague, Dr. Gurbani appears to claim that she reported to Dr. McMillan the same allegations of misconduct by the trauma faculty that she says she had been making to Dr. LaPorte. Dr. McMillan testified that she was not aware of those allegations at that time.

16

2012, Dr. Osgood asked Dr. Gurbani to meet him at a bar for an evaluation meeting. Dr. Gurbani did not agree to do so. She told Dr. LaPorte that Dr. Osgood's suggestion made her feel uncomfortable.

On June 27, 2012, Dr. Gurbani received a letter from Dr. LaPorte outlining the "guidelines and expectations" for her probation. The letter informed Dr. Gurbani that she would spend another two months on the pediatric orthopaedic service, followed by another two months on the orthopaedic trauma service. The letter stated that she would meet every week for "formal verbal feedback" from at least one attending physician, that she would confer with Dr. LaPorte every two weeks, and that she would receive "written feedback" every two to four weeks. A five-member committee (Dr. LaPorte; Dr. Sponseller and Dr. Ain from pediatric orthopaedics; Dr. Osgood from orthopaedic trauma; and another attending physician from a previous rotation) would evaluate her progress after two months. After the full four months, the committee would decide whether to promote her, to allow her to continue at the second-year postgraduate level, or to dismiss her from the program. The letter included an extensive list of deficiencies and performance criteria.

On July 1, 2012, Dr. Gurbani signed a new residency contract under which she was reappointed at the second-year postgraduate level, but not promoted to the third-year level. The contract stated that it would be in effect for a maximum of 12 months, expiring at the end of June 2013. The terms generally were similar to those of the first contract, although some terms and policy documents had been updated.

17

**H.      Probation and the Committee's Decision to Dismiss Dr. Gurbani**

Dr. Gurbani repeated the pediatric orthopaedics rotation in July and August of 2012. On his evaluations, Dr. Sponseller reported improvement in some areas, but continued to identify weaknesses in her technical surgical skills, particularly her motor skills. Dr. Ain submitted an evaluation that, while more favorable than his previous ones, reflected that Dr. Gurbani continued to fall below his expectations for critical thinking and patient presentation skills.

During this rotation, Dr. Sponseller reported that Dr. Gurbani caused a "dural tear"[10] in what should have been a "routine" procedure. At his deposition, Dr. Sponseller explained that he remembers the incident "clearly because it was so remarkable" in how it "deviated from standard practice and from what [he] would expect and trust in a resident." Dr. Sponseller explained that he and Dr. Gurbani were standing on opposite sides of the patient while he was "giving her a chance to expose the spine to demonstrate her surgical skills." He recalled that, "very early on in the procedure," they were "taking the muscles off the spine" when he suddenly "saw spinal fluid coming out on her side" even though there was "a pretty strong barrier between where she was working and the spinal dura." According to Dr. Sponseller, surgeons sometimes cause tears "when they're working around the dura," but it was the "first time" he had seen someone cause a dural tear while working "several levels above the dura." Although he was able to repair

---

[10] A "dural tear" is a tear in the dura or dura mater, "the tough fibrous membrane that envelops the brain and spinal cord[.]" Dura Mater, MERRIAM-WEBSTER DICTIONARY ONLINE, https://www.merriam-webster.com/dictionary/dura%20mater.

the tear without complication, the incident indicated to him that Dr. Gurbani was "not aware of how to use [her] hands" and did not "have a good sense of surgical skill and timing." Dr. Gurbani admits that she was present during that procedure, but professes not to believe that she caused the dural tear.

Midway through the probation period, Dr. LaPorte consulted with Dr. Sponseller and Dr. Ain, but did not convene the entire probation committee. Afterwards, Dr. LaPorte and Dr. Sponseller met with Dr. Gurbani to discuss her progress and to advise her about the upcoming rotation. On behalf of the pediatric orthopaedics faculty, Dr. Sponseller emailed Dr. Osgood and Dr. Hasenboehler to say that they believed that Dr. Gurbani was "much improved" and "on track to be a good [second-year resident,]" but that she "still need[ed] more work with her hands/motor skills" and "still lack[ed] a little confidence and common sense in planning and decision making."[11]

At the time that Dr. Gurbani started her second attempt at the orthopaedic trauma rotation, Dr. Osgood belatedly submitted his evaluations from her first attempt earlier in the year. Dr. Osgood identified weaknesses in Dr. Gurbani's "knowledge of anatomy" and noted that she had "obvious difficulties" in "handling tools and using them effectively in surgery." He commented that he had observed some "incremental improvement" with some motor skills by the end of the rotation but that she "did not improve significantly in the ways [they] discussed were most important for progress and

---

[11] Over a month after the second rotation in pediatric orthopaedics, Dr. Tis submitted an evaluation more favorable than his prior ones. Dr. Tis observed that Dr. Gurbani was "[w]orking extremely hard[,]" and he opined that "[i]f she continue[d]" to do so, he had "no doubt that she w[ould] be a safe, reliable surgeon."

19

advancement as an orthopaedic surgeon." Dr. Osgood opined that she "did not seem to take [his] comments seriously" and that she "interprets critique of her work as a personal affront[.]"

Although the probation letter stated that Dr. Gurbani would receive formal verbal feedback every week, neither Dr. Osgood nor Dr. Hasenboehler met with her for feedback sessions outside of their clinical interactions. They nevertheless continued to convey their impressions to Dr. LaPorte, who continued to meet regularly with Dr. Gurbani. After two weeks, Dr. Gurbani complained to Dr. LaPorte that she was frustrated about the lack of formal feedback. A week later, Dr. Osgood did meet her for one feedback session, in the cafeteria.

Dr. Gurbani continued to complain to Dr. LaPorte that the members of the trauma faculty were not allowing her to operate as frequently as she had during previous rotations. She complained that she felt that she was "being judged differently from other residents" on the trauma service. Dr. Gurbani says that, at these meetings, she complained that she felt that she was "being bullied" by Dr. Osgood and Dr. Hasenboehler, in that they would "yell" at her apparently with little justification or use "language and tone" that seemed "disrespectful" to her. In her memos, Dr. LaPorte wrote that Dr. Gurbani believed that she had "not been well received" by her two attending physicians or the senior resident and that "the team dynamic [was] dysfunctional."

The committee met on October 11, 2012, ten days before the scheduled end of the probation period. The meeting memo states that Dr. Sponseller, Dr. Ain, Dr. Osgood, and Dr. Hasenboehler each identified a different combination of deficiencies in her

20

medical knowledge, motor skills, decision-making, communication skills, and professionalism. The "majority opinion" was that she was "not likely to progress to a point where she would be able to practice safely and independently without supervision." The committee concluded that there was "no reason to expect . . . a significant change in her performance" after she had been unable to do so after "four months where she had been working at maximum effort." The committee immediately informed Dr. Gurbani of its decision to dismiss her from the program.

Dr. Osgood and Dr. Hasenboehler did not submit written evaluations of Dr. Gurbani's performance on her second orthopaedic trauma rotation until over a month after her dismissal from the program. Although they highlighted different details, both of them described deficiencies in her knowledge and technical skills as a surgeon.

Dr. Gurbani appealed the committee's termination decision to the chair of the orthopaedic surgery department, who upheld the decision after meeting with her and reviewing her evaluations.

## I.     Dr. Gurbani's Pursuit of Reinstatement in the Program

After her dismissal from the residency program, Dr. Gurbani explored the possibility of pursuing other medical specialties at Johns Hopkins. While looking into Dr. Gurbani's background, a professor from another department discovered that she had made false statements to the Board of Physicians by failing to disclose the prior probation from her residency at the University of Pennsylvania. Dr. LaPorte and Dr. McMillan then told Dr. Gurbani that they were aware of her false statements to the Board of Physicians.

21

Soon thereafter, Dr. Gurbani wrote a letter to the Board of Physicians to report what she called an "error" on her registration forms. Dr. Gurbani wrote that she could "only assume" either that she was not "sufficiently careful in filling out" the forms or that she "did not realize that th[e] question" on the forms "included the type of probation [she] had been on at the University of Pennsylvania." Contrary to that explanation, Dr. Gurbani now claims that she was "following Dr. LaPorte's advice" when she made false statements to the Board of Physicians.

Dr. Gurbani continued to receive salary and benefits until her contract term expired at the end of June 2013. None of the other departments at Johns Hopkins offered her the opportunity to transfer.

In August 2013, Dr. Gurbani initiated a formal grievance under the University's procedures. She wrote to the chair of the grievance panel accusing Dr. Osgood, Dr. Hasenboehler, Dr. LaPorte, and Dr. McMillan of violating University and ACGME policies.[12] She sought to be reinstated in the residency program, without being required to work with Dr. Osgood or Dr. Hasenboehler in the future.

Dr. LaPorte and Dr. McMillan submitted to the grievance panel the various evaluations, memos, and emails that documented the process that culminated in the dismissal. Dr. Gurbani responded with a point-by-point rebuttal in which she denied

---

[12] Dr. Gurbani incorrectly asserts that the University allowed Dr. McMillan "to handpick" the panel chair even though she had filed a grievance against Dr. McMillan. There is no evidence that she had named Dr. McMillan as a subject of her grievance until her August 2013 letter, which was addressed to the panel chair who had already been selected.

22

responsibility for nearly every reported instance of inadequate performance (such as the dural tear or the missed diagnosis of compartment syndrome).

In accordance with the University's procedures, the panel chair attempted to resolve the grievance through informal discussions until those efforts failed.[13]  Over a multi-month period, the grievance panel conducted interviews with Dr. Gurbani, the four doctors who were the subject of her grievance, and other faculty members.

On March 11, 2014, the grievance panel issued a comprehensive report recommending that Dr. Gurbani not be reinstated in the program.  The panel noted that, despite some of her strengths as a physician, faculty members observed that her "technical skills" fell below expectations, that she "was not able to apply book knowledge to the synthesis of diagnoses," and that she had other "deficiencies in clinical documentation and lapses in professionalism and communication with patients and staff." The panel opined that she "should have received more regular written feedback, in addition to the notes in the [computerized evaluation] system, during her first year and more frequent formal and written feedback during her probationary trauma rotation." Overall, however, the panel found that she "received adequate verbal communication about the program's expectations and the deficiencies in her performance, and notice of the changes in her status, and that she was given ample opportunities for training and remediation."  The panel rejected her allegations that she had been "denied fair treatment,

---

[13] The director of the orthopaedic surgery department rejected a compromise that would have allowed Dr. Gurbani to return as a second-year postgraduate resident, citing her "difficulties" in the program and her "misrepresentation of fact in a signed statement to the Maryland Board of Physicians, on two occasions."

the opportunity to file a grievance, or due process." The panel "did not find that the department acted in an arbitrary or capricious manner[,]" but instead found that the department had "exercised reasonable judgment" in deciding to dismiss her.[14]

On March 31, 2014, the dean of the medical faculty informed Dr. Gurbani that he had accepted the panel's unanimous recommendation not to reinstate her in the program.

In the aftermath of her dismissal, Dr. Gurbani applied to other residency programs with the goal of continuing her training as an orthopaedic surgeon. By the middle of 2015, she secured an appointment at the third-year postgraduate level in an orthopaedic surgery residency program at the University of Texas.

## J.    Dr. Gurbani's Action against the University and Its Employees

On June 5, 2015, Dr. Gurbani filed a four-count complaint in the Circuit Court for Baltimore City. She claimed that her dismissal from the residency program caused "irreparable damage to her career" through the "severe interruption of her training" and the "indelible black mark" on her record. She sought to recover past and future income, other consequential damages, punitive damages, and attorneys' fees.

In Count I of her complaint, Dr. Gurbani alleged that Johns Hopkins University[15]

---

[14] The panel explained that it was unpersuaded by Dr. Gurbani's rebuttal, writing: "in her long and detailed list of objections to evaluation scores and patient care critiques, Dr. Gurbani exhibits a pattern of unwillingness to assume personal responsibility for errors and a tendency to deflect criticisms of her shortcomings." The panel also noted that she "frequently responded to [feedback] in ways that were counter-productive" and that she "did not seem to truly understand or learn from the continuing constructive verbal feedback and criticism given to her by a number of faculty and [senior] residents."

[15] The complaint named four entities as defendants: Johns Hopkins Health System Corp.; Johns Hopkins Hospital, Inc.; Johns Hopkins Medicine; and Johns Hopkins

24

breached the 2011 and 2012 residency contracts through various acts. The list of alleged breaches included: "falsely evaluating her performance," refusing to promote her, placing her on probation, "denying her an opportunity to appeal the probation," "violating the probation terms," ending the probation prematurely, terminating her appointment, allowing "excessive delay" before hearing the grievance, and "presenting false and manufactured evidence" to the grievance panel.

In Count II, she alleged that, through those same acts, the University had violated the implied covenants of good faith and fair dealing from both contracts.

The third count, styled as "Tortious Interference," named Dr. LaPorte, Dr. Osgood, and Dr. Hasenboehler as defendants. Dr. Gurbani alleged that those three defendants interfered with her contracts by "withholding feedback" and "falsifying information" about her performance with the intent to cause her to be terminated. Although her complaint identified those defendants as "contract employees" of Johns Hopkins, she alleged that their "acts were not part of [their] official job duties."

In the final count, Dr. Gurbani alleged that the University was negligent in retaining and supervising Dr. Osgood and Dr. Hasenboehler when it knew or should have known that those two employees were deliberately trying to cause her to be terminated.

All defendants jointly moved for summary judgment at the end of the lengthy

---

University. This opinion treats those defendants collectively as Johns Hopkins University, the party identified in the residency contracts. The legal arguments raised here are identical as to all four of those defendants.

25

discovery period. The circuit court received exhaustive briefing[16] and conducted a two-hour hearing. In an order entered on September 29, 2016, the court granted the defendants' motion as to all counts. The court issued no separate opinion, but it stated the grounds for summary judgment in its order.

The circuit court determined that the claims against the University could not proceed in light of *Hunter v. Board of Education of Montgomery County*, 292 Md. 481 (1982). The court observed that, in *Hunter*, the Court of Appeals established a policy of "declining to entertain . . . educational negligence and breach of contract actions" (*id.* at 490) based on an allegation that an educator improperly evaluated a student. On that basis, the circuit court concluded that the University was entitled to judgment as to the counts for breach of contract, breach of implied covenant of good faith and fair dealing, and negligent retention and supervision.

The circuit court concluded that the three University employees (Dr. Osgood, Dr. Hasenboehler, and Dr. LaPorte) were entitled to judgment on the remaining count for tortious interference with contract. The court explained that a party cannot interfere with its own contract and that "employees acting on behalf of an employer within the scope of their authority are not viewed as separate actors from their employers."

Dr. Gurbani noted a timely appeal from the judgment.

---

[16] The defendants submitted a 50-page memorandum, supported by 64 exhibits. Dr. Gurbani responded with a 122-page memorandum in opposition to the motion for summary judgment, supported by 138 exhibits. The defendants replied with a 45-page memorandum, supported by another 36 exhibits. The court then granted Dr. Gurbani's motion to submit another 18 exhibits for consideration.

**DISCUSSION**

Dr. Gurbani's appellate brief poses eight interrelated questions, which we have reproduced in the appendix to this opinion. In substance, she challenges the correctness of the grant of summary judgment as to all counts.

Under Maryland Rule 2-501(f), the circuit court shall grant a motion for summary judgment "if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law." The question of whether a circuit court correctly granted summary judgment "is a question of law . . . 'subject to a non-deferential review on appeal.'" *Schneider Elec. Bldgs. Critical Sys., Inc. v. Western Sur. Co.*, 454 Md. 698, 705 (2017) (quoting *Tyler v. City of College Park*, 415 Md. 475, 498 (2010)).

On an appeal from a grant of summary judgment, the appellate court "examine[s] 'the same information from the record and determine[s] the same issues of law as the trial court.'" *La Belle Epoque, LLC v. Old Europe Antique Manor, LLC*, 406 Md. 194, 209 (2008) (quoting *Miller v. Bay City Prop. Owners Ass'n, Inc.*, 393 Md. 620, 632 (2006)). The court must view the facts "'in the light most favorable to the nonmoving party and construe any reasonable inferences that may be drawn from the facts against the moving party.'" *Windesheim v. Larocca*, 443 Md. 312, 326 (2015) (quoting *Myers v. Kayhoe*, 391 Md. 188, 203 (2006)). The appellate court independently determines whether a genuine dispute of material fact exists and, if not, whether the moving party was entitled to judgment as a matter of law. *Kiriakos v. Phillips*, 448 Md. 440, 455 (2016).

In her brief, Dr. Gurbani emphasizes that there are countless factual disputes

27

within the thousands of pages of materials that the parties submitted to the circuit court. Most notably, her firsthand accounts of her experiences in the residency program conflict with the testimony and reports from the faculty and administrators. Because a court may not weigh the credibility of witnesses at the summary judgment stage, our analysis begins by assuming that a trier of fact could credit Dr. Gurbani's testimony about her interactions with University employees. *See, e.g.*, *Rowhouses, Inc. v. Smith*, 446 Md. 611, 662-63 (2016) (explaining that, at the summary judgment stage, a court cannot determine that a witness is not credible even where the witness's testimony "may be perceived as 'self-serving'"); *Okwa v. Harper*, 360 Md. 161, 182 (2000) (explaining that the summary judgment rule does not allow the court to "give credence to certain facts and refuse to credit others" where witnesses give different versions of events).

But merely generating factual disputes will not necessarily defeat a properly supported summary judgment motion. *Appiah v. Hall*, 416 Md. 533, 546 (2010). "Rather, the crux of the inquiry is whether the disputed fact is material, or, 'a fact the resolution of which will somehow affect the outcome of the case.'" *Deutsche Bank Nat'l Tr. Co. v. Brock*, 430 Md. 714, 727 (2013) (quoting *Lippert v. Jung*, 366 Md. 221, 227 (2001)). "A 'dispute as to facts relating to grounds upon which the decision is not rested . . . does not prevent the entry of summary judgment.'" *Boland v. Boland*, 423 Md. 296, 366 (2011) (quoting *Salisbury Beauty Sch. v. State Bd. of Cosmetologists*, 268 Md. 32, 40 (1973)).

The party opposing a summary judgment motion must "identify with particularity" each factual dispute and must "identify and attach" the supporting evidentiary materials.

Md. Rule 2-501(b). Accordingly, "mere general allegations or conclusory assertions which do not show facts in detail and with precision will not suffice to overcome a motion for summary judgment." *Educ. Testing Serv. v. Hildebrant*, 399 Md. 128, 139 (2007). As the circuit court observed: "A plaintiff's claim must be supported by more than a 'scintilla of evidence[,]' as 'there must be evidence upon which [a] jury could reasonably find for the plaintiff.'" *Blackburn Ltd. P'ship v. Paul*, 438 Md. 100, 108 (2014) (quoting *Beatty v. Trailmaster Prods., Inc.*, 330 Md. 726, 738-39 (1993)).

Where the moving party attests to a material fact, the non-moving party must do more than simply show some "conjectural" or "metaphysical" doubt as to that fact. *See Windesheim v. Larocca*, 443 Md. at 329-30 (citations and quotation marks omitted). "The facts offered by a party opposing summary judgment 'must be material and of a substantial nature, not fanciful, frivolous, gauzy, spurious, irrelevant, gossamer inferences, conjectural, speculative, nor merely *suspicions*.'" *Id.* at 330 (emphasis in *Windesheim v. Larocca*) (quoting *Carter v. Aramark Sports & Entm't Servs., Inc.*, 153 Md. App. 210, 225 (2003)).

## I.      Claims against the University for Breach of Contract and Negligence

### A.      Challenge to the Substance of the Dismissal Decision

The circuit court identified *Hunter v. Board of Education of Montgomery County*, 292 Md. 481 (1982), as the ground for summary judgment as to the claims against the University for breach of contract and negligence. In *Hunter*, the Court of Appeals refused to "recognize a tort action seeking damages based on negligent education." *Tabor v. Balt. City Pub. Sch.*, 138 Md. App. 747, 751 (2001). Under *Hunter*, a plaintiff

29

cannot recover damages "for error in evaluation for purposes of educational placement," regardless of how the plaintiff's claim might be characterized. *Doe v. Bd. of Educ. of Montgomery Cnty.*, 295 Md. 67, 78-79 (1982).

Specifically, the *Hunter* opinion addresses whether an action "can be successfully asserted against a school board and various individual employees for improperly evaluating, placing or teaching a student." *Hunter v. Bd. of Educ. of Montgomery Cnty.*, 292 Md. at 483. A trial court concluded that the Hunters, two parents suing on behalf of their minor child, could not maintain such an action. *Id.*

The Hunters alleged that their child developed learning deficiencies because the local school system negligently evaluated his abilities and required him to repeat first-grade materials while he was physically placed in the second grade. *Id.* at 483-84. Although they raised multiple theories for the source of an alleged duty, the "gravamen" of their claim "sound[ed] in negligence, asserting [a right to] damages for the alleged failure of the school system to properly educate" the child. *Id.* at 484.

Citing an extensive body of out-of-state authority, the Court of Appeals observed that "so-called 'educational malpractice' claims" had been "unanimously rejected" in other jurisdictions based on "considerations of public policy[.]" *Id.* (collecting authorities). The Court identified three main considerations underlying those decisions: (1) "the absence of a workable rule of care against which the defendant's conduct may be measured"; (2) "the inherent uncertainty in determining the cause and nature of any damages"; and (3) "the extreme burden which would be imposed on the already strained resources of the public school system to say nothing of those of the judiciary." *Id.*

30

Upon review of those cases, the Court concluded that "an award of money damages . . . represents a singularly inappropriate remedy for asserted errors in the educational process." *Id.* at 487. The Court emphasized that the "misgivings" other courts had expressed about "the establishment of legal cause and the inherent immeasurability of damages" in an educational negligence action "are indeed well founded." *Id.* at 487-88. The Court reasoned that the recognition of such an action "would in effect position the courts of this State as overseers of both the day-to-day operation of our educational process as well as the formulation of its governing policies." *Id.* at 488. The Court was reluctant to impose such a responsibility on the courts. *Id.*

In addition to their negligence claims, the Hunters had alleged a "breach of an 'implied contract'" in one count of their complaint. *Id.* at 489 n.5. The Court concluded that the defendants were entitled to dismissal "[w]ith respect to the contract claim" as well, explaining: "[W]hat we have said in this opinion concerning the uncertainty of damages, the difficulty in determining legal cause, and the public policy factors precluding negligence claims remains true whether the allegations state breach of contract or tort and we discuss it no further." *Id.*

Here, Dr. Gurbani points out many ways in which her claims against Johns Hopkins University differ from the Hunters' claims against the county board of education. Obviously, Dr. Gurbani was not a minor child enrolled in a public school administered by State and local agencies. She was an adult physician employed under a contract with a private university as part of a program accredited by a national non-profit organization. She contends that *Hunter* should "have no applicability" to a resident's

31

claim "for breach of an express contract with a private medical institution." She further contends that her claims do not implicate the same policy concerns identified in *Hunter*. Her adversaries agree that the factual context here is different from that of *Hunter*, but they argue that the "public policy reasons that underlie *Hunter* are even more compelling in the case of a private medical school."

Even as Dr. Gurbani encourages this Court to confine *Hunter* to its own factual context, she appears to recognize that *Hunter* is only a single example of a broader body of case law that overwhelmingly favors judicial deference to academic decisions at all levels of education. Other courts agree that "the policy concerns that preclude a cause of action for educational malpractice apply with equal force to bar a breach of contract claim attacking the general quality of an education." *Ross v. Creighton Univ.*, 957 F.2d 410, 416 (7th Cir. 1992) (citing *Hunter v. Bd. of Educ. of Montgomery Cnty.*, 292 Md. at 586 n.5, and other cases). Courts have opined that "the 'rule of judicial nonintervention in academic affairs is particularly appropriate in the health care field . . . because a medical school must be the judge of the qualifications of its students to be granted a degree; courts are not supposed to be learned in medicine and are not qualified to pass opinion as to the attainments of a student in medicine.'" *Burke v. Emory Univ.*, 338 S.E.2d 500, 501 (Ga. Ct. App. 1985) (alteration in original) (further quotation marks omitted) (quoting *Jansen v. Emory Univ.*, 440 F. Supp. 1060, 1063 (N.D. Ga. 1977), *aff'd*, 579 F.2d 45 (5th Cir. 1978) (per curiam)). "These considerations are particularly apt where the institution involved is a *private* college or university." *Alden v. Georgetown Univ.*, 734 A.2d 1103, 1110 n.9 (D.C. 1999) (citing *Bilut v. Northwestern*

32

*Univ.*, 645 N.E.2d 536, 541 (Ill. App. Ct. 1994)); *see also Burke v. Emory Univ.*, 338 S.E.2d at 501-02.[17]

The United States Supreme Court endorsed this deferential approach in two cases in which it rebuffed efforts by former students to challenge their dismissals from medical degree programs at state universities. In *Board of Curators of University of Missouri v. Horowitz*, 435 U.S. 78, 90 (1978), the Court held that a state university does not deny a student due process when it dismisses the student for academic reasons without affording a hearing. The Court reasoned that "the determination whether to dismiss a student for academic reasons requires an expert evaluation of cumulative information and is not readily adapted to the procedural tools of judicial or administrative decisionmaking." *Id.* at 90. In the Court's view, "[a] graduate or professional school is, after all, the best judge of its students' academic performance and their ability to master the required curriculum." *Id.* at 85 n.2.

Likewise, in *Regents of University of Michigan v. Ewing*, 474 U.S. 214 (1985), the

_____

[17] Dr. Gurbani has cited a handful of idiosyncratic cases in which a student survived a dispositive motion in a suit against an educational institution. Only a few of the cases she cites are reported cases that involve academic dismissals. Those cases fail to establish that courts have stronger reasons to oversee academic decisions simply because the institution has a contract with the student or is a private medical school. At most, those cases illustrate that in some circumstances a contract itself may limit an educational institution's discretion to summarily dismiss a student. *E.g. Pieszak v. Glendale Adventist Med. Ctr.*, 112 F. Supp. 2d 970, 998 (C.D. Cal. 2000) (contract entitled medical resident to a hearing before termination from residency program); *Jabbour v. Albany Med. Ctr.*, 237 A.D.2d 787, 788-89 (N.Y. App. Div. 1997) (contract required that medical center could terminate resident only for "good cause"); *Univ. of Texas Health Sci. Ctr. at Houston v. Babb*, 646 S.W.2d 502, 506 (Tex. App. 1982) (contract did not permit school to dismiss student nurse as long as she completed requirements in six years and maintained a 2.0 grade point average).

Supreme Court declared: "When judges are asked to review the substance of a genuinely academic decision, . . . they should show great respect for the faculty's professional judgment." *Id.* at 225. "Plainly," the Court said, judges "may not override [an academic decision] unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Id.* The Court added: "'University faculties must have the widest range of discretion in making judgments as to the academic performance of students and their entitlement to promotion or graduation.'" *Id.* at 225 n.11 (quoting *Bd. of Curators of Univ. of Missouri v. Horowitz*, 435 U.S. at 96 n.6 (Powell, J., concurring)).

The decision to dismiss a medical student because of unsatisfactory clinical evaluations is a well-recognized example of an academic decision. In the *Horowitz* case, the medical student had been placed on probation after several faculty members expressed dissatisfaction with her performance and dismissed after the faculty observed insufficient improvement during the probation period. *Bd. of Curators of Univ. of Missouri v. Horowitz*, 435 U.S. at 81-82. The Court characterized the dismissal as "academic" because it rested on the "judgment of school officials that [the student] did not have the necessary clinical ability to perform adequately as a medical doctor and was making insufficient progress toward that goal." *Id.* at 89-90. In a concurring opinion, Justice Powell explained that an evaluation of the medical student's clinical performance was "no less an 'academic' judgment because it involves observation of her skills and techniques in actual conditions of practice, rather than assigning a grade to her written answers on an essay question." *Id.* at 95 (Powell, J., concurring).

34

Dr. Gurbani nevertheless insists that "academic deference is not appropriate in the context of a private, medical residency program" governed by a written contract. She tells us that it is "simply incorrect" for the University to "argue that 'court[s] have long held that the decision to terminate a medical resident is an academic decision.'" Her assertions lack merit. *See Fenje v. Feld*, 398 F.3d 620, 625 (7th Cir. 2005) (treating decision to dismiss medical resident as an academic decision); *Shaboon v. Duncan*, 252 F.3d 722, 731 (5th Cir. 2001) (same); *Davis v. Mann*, 882 F.2d 967, 974 (5th Cir. 1989) (same); *Gupta v. New Britain Gen. Hosp.*, 687 A.2d 111, 117-18 (Conn. 1996) (same); *Ross v. Univ. of Minnesota*, 439 N.W.2d 28, 33 (Minn. Ct. App. 1989) (same); *Hernandez v. Overlook Hosp.*, 692 A.2d 971, 975 (N.J. 1997) (same); *Abdullah v. State*, 771 N.W.2d 246, 255 (N.D. 2009) (same); *Gul v. Ctr. for Family Med.*, 762 N.W.2d 629, 635-36 (S.D. 2009) (same).

Even in her own brief, Dr. Gurbani calls attention to *Gupta v. New Britain General Hospital*, 687 A.2d 111 (Conn. 1996), a case in which a court determined that a physician's dismissal from a private medical residency program was properly grounded in academic reasons. The facts of that case will sound familiar to any reader of this opinion. The plaintiff was a physician who transferred into a five-year general surgical residency program. *Id.* at 576-77. He entered into a one-year contract that could be renewed as long as he received favorable evaluations. *Id.* at 577-78. As he progressed through more advanced stages of the program, faculty members began to express doubt about whether he could improve enough to complete his residency. *Id.* at 578. The hospital continued to renew his contract, but decided to place him on probation and

ultimately dismissed him during the probation period because of his "inability to make decisions in the operating room, his unwillingness to accept responsibility for errors, and gaps in [his] 'knowledge base.'" *Id.* at 579. A committee upheld the dismissal when the physician challenged the decision internally. *Id.* at 579-80.

The physician sued the hospital, alleging breach of the residency agreement and of the implied covenant of good faith and fair dealing. *Id.* at 580. The trial court granted summary judgment in favor of the hospital, concluding that the decision to dismiss the resident was entitled to deference as an academic decision. *Id.* at 580-81. On review, the Supreme Court of Connecticut recognized that "the residency agreement created a hybrid relationship containing both employment *and* educational features." *Id.* at 586. Yet the Connecticut high court explained that the dismissal, based on the unfavorable assessments of the resident's potential to become a safe and independent surgeon, "implicated the educational component of the residency agreement and was, therefore, an academic decision." *Id.* at 589.

We see no reason (and Dr. Gurbani supplies none) to reach a different conclusion regarding her dismissal, which was expressly based on the committee's assessment that she was "not likely to progress to a point where she would be able to practice safely and independently without supervision." That academic decision, the result of a careful and deliberate exercise of professional judgment, is entitled to deference. It may not serve as a basis for Dr. Gurbani's claims for breach of contract or negligence.

Although Dr. Gurbani tells us that her breach-of-contract claim does not implicate the faculty's exercise of professional judgment, her submissions show the opposite.

36

Many factual assertions in her complaint, her memorandum in opposition to summary judgment, and her appellate brief invite the court to make its own judgment about whether she "performed at a satisfactory level" as she claims, and thus whether she deserved promotion. She calls into question the events that informed the evaluations (by, for instance, denying her responsibility for causing a dural tear). She also calls into question whether her evaluations in the aggregate justified her probation and dismissal (by, for instance, offering evidence that the program retained other residents who had similar evaluations). The main allegation from the first two counts of her complaint is that the University "refus[ed] to promote her," even though (in her view, and contrary to that of her evaluators) she "met all program requirements and did not, otherwise, commit any act constituting cause for placement on probation and termination from the residency program." Only after her adversaries moved for summary judgment did she attempt to repackage the contract claim as a challenge to something other than her dismissal from the residency program. Her appellate briefs confirm that her alleged damages all derive from the dismissal, which allegedly stalled her pursuit of a lucrative career as an orthopaedic surgeon.

Simply put, Dr. Gurbani's central claims entailed a challenge to an academic decision to end her involvement in the residency program. Courts must defer to such a decision where, as here, the decision resulted from the actual exercise of professional judgment. The circuit court, therefore, did not err in directing the entry of summary

37

judgment against her.[18]

> **B.** <u>**Challenge to the Process that Culminated in the Dismissal**</u>

In addition to her challenge to the University's professional judgment in deciding to terminate her residency, Dr. Gurbani contends that Johns Hopkins breached specific and identifiable provisions of its contracts with her. She argues that she should be allowed to maintain her action on a narrower theory that the University breached "a specific contractual promise distinct from any overall obligation to offer a reasonable program." *Gupta v. New Britain Gen. Hosp.*, 687 A.2d at 120.

The essence of such a claim is that the institution did not perform a promised educational service at all, not that it inadequately performed the promised service. *See Ross v. Creighton Univ.*, 957 F.2d at 416-17. Thus, to establish a viable claim for breach of an educational services contract, a plaintiff "must do more than simply allege that the education was not good enough." *Id.*; *see also CenCor, Inc. v. Tolman*, 868 P.2d 396, 398-99 (Colo. 1994) (en banc) (citing *Hunter v. Montgomery Cnty. Bd. of Educ.*, 292 Md. at 489 n.5, and other cases) ("[c]ontract claims that in fact attack the general quality of educational experiences" raise "questions concerning the reasonableness of conduct by educational institutions in providing particular educational services to students – questions that must be answered by reference to principles of duty, standards of care, and

---

[18] Although courts must defer to academic decisions when reviewing claims for breach of contract or negligence, they are not precluded from considering statutory claims of discrimination (based on race, sex, national origin, age, disability, etc.) in the context of academic decisions. *E.g. Hajjar-Nejad v. George Washington Univ.*, 37 F. Supp. 3d 90, 124-42 (D.D.C. 2014); *Pieszak v. Glendale Adventist Med. Ctr.*, 112 F. Supp. 2d 970, 987-91 (C.D. Cal. 2000). Dr. Gurbani has not raised such a claim here.

reasonable conduct associated with the law of torts").

Dr. Gurbani's briefs include multiple attempts to identify a breach of "a specific contractual promise distinct from any overall obligation to offer a reasonable program." Most of the provisions that she identifies are neither specific nor meaningfully distinct from the University's general obligation to educate her. *See Gupta v. New Britain Gen. Hosp.*, 687 A.2d at 120 (holding that general allegations by a dismissed physician that a residency program failed to adequately train the physician were insufficient to establish claim for breach of residency agreement).

For instance, Dr. Gurbani points to the University's obligations under both contracts to provide "appropriate and adequate faculty and Medical Staff supervision for all educational and clinical activities." In both contracts, the University promised to "evaluate, through the Program Director and Program faculty, the educational and professional progress and achievement" of the resident "on a regular and periodic basis." The 2011 contract (but not the 2012 version) also stated that the University would "[p]rovide leadership, organizational structure, and resources to enable" the University "to achieve substantial compliance" with requirements established by the ACGME. It explained that "regular assessment" of the performance of residents is an "essential component[] of this commitment." The ACGME's program requirements, in turn, stated that the "faculty must evaluate resident performance in a timely manner during each rotation . . . and document this evaluation at the completion of the assignment."[19]

---

[19] The University does not specifically dispute Dr. Gurbani's assertion that the ACGME program requirements are incorporated by reference into the 2011 contract.

Citing these provisions, Dr. Gurbani argues that the University failed to provide what she calls "the expressly promised training and feedback and required regular and timely written performance feedback" during the two rotations that preceded her probation. Yet it is undisputed that the faculty did supervise her clinical work and did evaluate her performance from those rotations. At most, the evidence shows that some attending physicians were less than prompt in submitting their formal written evaluations. Dr. Gurbani did not adduce evidence suggesting that the physicians failed to offer any feedback at all.

Dr. Gurbani's arguments about inadequate "feedback" appear to employ that word in a narrow sense, to mean either a formal, written evaluation or a structured, face-to-face conference. Dr. Osgood expressed a different view of the teaching process in his testimony. He opined that the "best feedback" occurs "on a daily basis, . . . at the moment when the failure occurs." Dr. Osgood testified that he provided this type of feedback "in the OR, in the clinic, [and] on board rounds especially." He opined that "all the points" addressed in a written evaluation have already been "discussed individually in person ad nauseum[.]" The University rejected Dr. Gurbani's grievance in part because the panel found that Dr. Osgood and Dr. Hasenboehler continued to provide this type of "informal 'hallway' feedback" until she was dismissed.

In any event, the provisions cited above do not amount to a specific promise to give "feedback" in a particular form or on a particular schedule. The contract does not define terms such as the "regular assessment" of residents or a "regular and periodic basis" and a "timely manner" for evaluations. Nor are these terms defined in the

40

University's written policies or in the ACGME's program requirements. Consequently, there is no objective standard to assess whether faculty members were so untimely in submitting some evaluations that the University can be said to have breached its obligations by failing to offer any feedback at all.

Dr. Gurbani further complains about the lack of formal feedback during her probation. She asserts that the University failed to provide all of the meetings and written feedback that Dr. LaPorte had described in the probation letter. Indeed, the faculty did not meet every expectation from the letter: Dr. Osgood met with Dr. Gurbani only once during her second rotation instead of weekly, and neither Dr. Osgood nor Dr. Hasenboehler gave her written feedback until after the committee decided to dismiss her.

Of course, the probation letter was not a contract, and it did not purport to modify the contracts. The very first sentence of the letter explained that it "set forth the guidelines and expectations of the probation period[.]" Dr. Gurbani points to nothing in either contract that might transform these "guidelines and expectations" into binding promises.

The University's probation policy required the program director to "provide a specific statement" to the resident "as to the action taken," which Dr. LaPorte did when she provided the letter. That policy did not require the University to strictly follow the program director's plan for improving the resident's performance. Throughout the probation period, the University was still obligated under the 2012 contract to have its faculty "evaluate" Dr. Gurbani's progress "on a regular and periodic basis." Yet this promise was no more specific or more objective than the identical promise from the 2011

41

contract.  It could not supply the basis for a claim of breach of contract.

Dr. Gurbani further contends that the contract required the University to give her "four-months' or reasonable notice prior to placing her on probation."  To the contrary, no such requirement existed.  The 2011 contract authorized the program director to impose probation as a "corrective action" in accordance with the University's general policy.  That policy recommends, but does not require, "verbal warnings" and "appropriate counseling" to residents whose performance is unsatisfactory.  A four-month delay before taking corrective action would make little sense because, as explained in the policy documents, academic probation gives the struggling resident "additional mentoring, counseling or repeating clinical experiences for the purpose of assisting the [resident] to bring his [or] her performance to an acceptable level."

It is true that the 2011 contract required the University to provide "written notice of *non-renewal* no later than four months" before the end of the appointment term or "as much written notice of the intent *not to renew* as the circumstances w[ould] reasonably allow" if the primary reasons for the nonrenewal occurred within those final four months. (Emphases added.)  Without question, the University did "renew" Dr. Gurbani's appointment at the end of the 2011 contract term; it merely declined to offer "promotion to the next level of training."  Even if the 2011 contract did require the same notice for a decision to renew an appointment without promotion, the notice clause would not have required the University to give that notice four months in advance.  As Dr. Gurbani appears to acknowledge, the probation decision was prompted by the faculty meeting that occurred five weeks before the end of her appointment term.  She fails to explain her

42

suggestion that the notice she received was unreasonably prompt.

Dr. Gurbani comes closer to identifying a specific obligation when she asserts that the University did not provide a "written midyear evaluation." A clause of the 2011 contract required the program director to "present to and discuss with the Resident a written summary of the evaluations at least once during each six month period of training[.]" There is no dispute that Dr. LaPorte met with Dr. Gurbani on January 26, 2012, to discuss evaluations from the first six-month training period. Indeed, Dr. Gurbani even admitted that they discussed the unfavorable evaluation from her sports medicine rotation. But although Dr. LaPorte testified that she had all of the written evaluations in front of her during the meeting, a charitable reading of the testimony shows that there may be some genuine dispute about whether Dr. LaPorte actually "present[ed]" a "written summary" of the evaluations to Dr. Gurbani during the meeting.

Perhaps the closest that Dr. Gurbani comes to identifying the failure to fulfill a specific obligation is when she alleges that the University denied her the right to take a grievance regarding the probation decision. Dr. Gurbani testified that she orally requested an "appeal or some type of formal grievance" at the time Dr. LaPorte placed her on probation in early June 2012, but Dr. LaPorte referred her to Dr. McMillan who told her "that [her] department was refusing [her] the ability to appeal, that they were not going to grant [her] that."

This testimony, viewed in the light most favorable to Dr. Gurbani, indicates that the University denied a request to initiate a grievance that she apparently was entitled to take under the contract. Eventually, Dr. Gurbani did initiate a formal grievance in

43

August 2013, long after she had been dismissed from the program. That grievance encompassed matters both before and after she was placed on probation, and the grievance panel ultimately denied her grievance on its merits.

The University responds that it complied with or at least substantially complied with its obligations to give feedback and a fair review process. In addition, the University argues that, even if Dr. Gurbani could show that it failed to comply with those obligations, she would not be entitled to pursue a claim for damages, because she would be unable to show that the alleged breaches resulted in the damages that she claims. We agree that Dr. Gurbani has not identified any damages that resulted from the arguable breach of one or two specific contractual undertakings.

As mentioned previously, the alleged damages derive from the decision to dismiss her from the program. That adverse decision was not the *direct* result of alleged breaches such as Dr. LaPorte's failure to present a "written" summary of her evaluations at the midyear meeting, or the faculty's tardiness in submitting some written evaluations, or the denial of her initial request for a grievance when she was placed on probation.

The University reminds us that "the inherent uncertainty in determining the cause and nature of any damages" (*Hunter v. Bd. of Educ. of Montgomery Cnty.*, 292 Md. at 484) was a major reason why the Court of Appeals refused to entertain actions based on alleged errors in the educational process. Dr. Gurbani replies that, "[u]nlike in *Hunter*, the question of damages in this case is straight-forward," because she claims to be able to show that "she was inappropriately removed," and that "as a result, her training and career was delayed" for several years. Indeed, she might be able to proffer an expert who

can quantify the value of a promotion to the third year of the residency program.  But her argument fails to establish the other necessary links between the alleged breaches, which she asserts were "all procedural" in nature, and the dismissal, which rested on substantive academic evaluations.  We fail to see how any reasonable factfinder could conclude that Dr. Gurbani would have advanced in the program if only the University had given her more timely written feedback or if only the University had processed the grievance as soon as she first requested it.

An appellate court confronted a similar claim in *Canady v. Meharry Medical College*, 811 S.W.2d 902 (Tenn. Ct. App. 1991).  There, a physician sued for damages resulting from a medical college's decision not to renew his contract for what would have been the final year of a five-year surgical residency program, because of his substandard clinical performance.  *Id.* at 903-04.  The trial judge found that the college did not strictly follow its procedures for a hearing on his possible reinstatement, but concluded that the physician's damages were too speculative for him to recover on his breach-of-contract claim.  *Id.* at 904.  The appellate court agreed, explaining:

> The damages claimed by plaintiff are based upon the theory that, *if* [the medical college] had meticulously followed its grievance procedure, he would have been successful in his defense against charges and in prosecution of his complaint; and that *as a result of such success*, he would have been reappointed for an additional year; that, at the conclusion of that year, his services would have received approval and certification; that plaintiff would thereby have attained admission to a further specialized residency which he would have successfully completed; and that he thereafter would have engaged in a successful and profitable specialized surgical practice.

*Id.* at 906 (emphasis in original).

The appellate court concluded that "the proximate relationship between the irregularities of procedure and the failure of plaintiff to realize his dream [wa]s too speculative and subject to too many future variables to show a proximate causal relationship between the irregularities and the claimed injury." *Id.* at 907.

This reasoning is consistent with *Hunter*, which recognized that academic achievement "'is influenced by a host of factors which affect the pupil subjectively, from outside the formal teaching process[.]'" *Hunter v. Bd. of Educ. of Montgomery Cnty.*, 292 Md. at 485 (quoting *Peter W. v. San Francisco Unified Sch. Dist.*, 131 Cal. Rptr. 854, 861 (Cal. Ct. App. 1976)). The inability to conclude that an educator's conduct caused a student's limited academic achievement was one major reason that the Court concluded that "an award of money damages" is "a singularly inappropriate remedy for asserted errors in the educational process." *Id.* at 487. This "difficulty in determining legal cause" remains present even where "the allegations state breach of contract" instead of negligence. *Id.* at 489 n.5.

In summary, although Dr. Gurbani has arguably generated evidence of a breach of one or two specific contractual undertakings, she has no evidence of any damages flowing from that breach. For that reason, the circuit court was correct when it granted the University's motion for summary judgment on the contract claims.[20]

---

[20] Dr. Gurbani also asserted a contractual claim for breach of the implied covenant of good faith and fair dealing, but "no independent cause of action at law exists in Maryland for breach" of that implied covenant. *Mount Vernon Props., LLC v. Branch Banking & Trust Co.*, 170 Md. App. 457, 472 (2006). "A breach of the implied duty of good faith and fair dealing is better viewed as an element of another cause of action at law, *e.g.*, breach of contract, than as a stand-alone cause of action for money damages[.]"

## C.      Negligent Retention and Supervision of Educators

After devoting most of her arguments to her contract-based claims, Dr. Gurbani also argues that *Hunter*'s "educational negligence framework" should not bar her claims against the University for the negligent retention and supervision of its educators. The gist of that claim is her assertion that the University breached a duty of care by "not taking action to ensure that Dr. Osgood and Dr. Hasenboehler were acting in a timely professional manner" and by "permitt[ing] them to file after-the-fact evaluations[.]"

This count for negligent retention and supervision "clearly sounds in negligence." *Gasper v. Ruffin Hotel Corp. of Maryland, Inc.*, 183 Md. App. 211, 231 (2008), *aff'd*, 481 Md. 594 (2011). Indeed, one count of the Hunters' complaint had alleged that the board of education was "negligent in evaluating its personnel and programs." *Hunter v. Bd. of Educ. of Montgomery Cnty.*, 47 Md. App. 709, 710 n.3 (1981), *aff'd in part, rev'd in part*, 292 Md. 481 (1982). The Court of Appeals upheld the dismissal of that count, observing that it "expressly state[d] [a] negligence claim[]" regarding the educational process. *Hunter v. Bd. of Educ. of Montgomery Cnty.*, 292 Md. at 489 & n.5; *see also James v. Frederick Cnty. Pub. Schs.*, 441 F. Supp. 2d 755, 759 (D. Md. 2006) (concluding that, under *Hunter*, Maryland does not recognize a claim against a board of education for "negligent hiring" of allegedly incompetent staff). So too, we must reject Dr. Gurbani's claim that the University should have intervened in the teaching of Dr.

---

*Id.* Dr. Gurbani nevertheless argues that her claim for breach of the implied covenant of good faith and fair dealing presents a viable "alternative theory" for a breach-of-contract claim, based on additional allegations of "bad faith conduct" by her educators. We address those allegations in Part II, below.

Osgood and Dr. Hasenboehler. Recognition of her claim would improperly require a court to import "tort principles," which are "difficult, if not impossible to apply in the academic environment[.]" *Gupta v. New Britain Gen. Hosp.*, 687 A.2d at 119.

## II. Claims Based on Allegations of Bad Faith

As explained above, Dr. Gurbani's dismissal resulted from an academic decision that must be afforded great deference. The University was entitled to judgment to the extent that Dr. Gurbani claimed that her dismissal instead resulted from the University's failure to meet its obligations, whether those obligations are grounded in the contracts or in a common-law duty.

The remainder of Dr. Gurbani's claims involve allegations that University employees acted in "bad faith" when they made academic decisions. Bad faith "'is not simply bad judgment or negligence, but implies a dishonest purpose or some moral obliquity and a conscious doing of wrong.'" *Rite Aid Corp. v. Hagley*, 374 Md. 665, 681 (2003) (quoting *Catterton v. Coale*, 84 Md. App. 337, 342 (1990)). Dr. Gurbani seeks to prove not merely that her evaluators misjudged her performance or abdicated their responsibilities to educate her. In her view, three University employees intentionally caused the dismissal for motives unrelated to their stated academic rationale. She suggests multiple legal theories for liability based on those allegations.

First, Dr. Gurbani contends that the University can be held liable for bad-faith conduct of its employees. "Educational discretion is . . . not limitless[,]" and "in exercising its professional judgment, an educational institution does not have license to act arbitrarily, capriciously, or in bad faith." *Gupta v. New Britain Gen. Hosp.*, 687 A.2d

48

at 121. "Accordingly, in cases involving academic dismissal, educational institutions will be entitled to summary judgment" on a breach-of-contract claim "unless the plaintiff can provide some evidence from which a fact finder 'could conclude that there was no rational basis for the decision or that it was motivated by bad faith or ill will unrelated to academic performance.'" *Alden v. Georgetown Univ.*, 734 A.2d at 1109 (quoting *Clements v. Nassau County*, 835 F.2d 1000, 1004 (2d Cir. 1987)).[21] Dr. Gurbani contends that evidence of bad-faith conduct by the University employees would support her claims that the University either breached the residency contracts (Count I) or breached the implied covenants of good faith and fair dealing (Count II).

Dr. Gurbani also contends that the three employees can be held personally liable for tortiously interfering (Count III) with her contract with their shared employer. It is well established that an employee cannot be held liable for "interfering" with a contract between the employer and another party where the employee was acting within the scope of employment. *See, e.g.*, *Pope v. Bd. of Sch. Comm'rs of Balt. City*, 106 Md. App. 578, 591 (1995). To establish such a claim against an employee, the plaintiff must show "that the employee in question somehow acted maliciously for his [or her] own motives and beyond the scope of his [or her] authority without the intent to further the interests of the employer." *Id.* at 591-92. Dr. Gurbani contends that evidence that Dr. LaPorte, Dr. Osgood, and Dr. Hasenboehler evaluated her based on personal spite would support her

---

[21] Dr. Gurbani does not dispute the University's contention that the decisions to place her on probation and to dismiss her from the program had a discernible rational basis.

49

claims for tortious interference.

Dr. Gurbani points out that even an educator may be held liable for committing intentional torts against a student. *See Hunter v. Bd. of Educ. of Montgomery Cnty.*, 292 Md. at 490. In *Hunter*, one count of the complaint alleged that "individual educators, acting intentionally and maliciously, furnished false information to [the Hunters] concerning the student's learning disability, altered school records to cover up their actions, and demeaned the child." *Id.* at 484. The Court concluded that this count stated a viable intentional tort claim, reasoning that "where an individual engaged in the educational process is shown to have wilfully and maliciously injured a child entrusted to his [or her] educational care, such outrageous conduct greatly outweighs any public policy considerations which would otherwise preclude liability[.]" *Id.* at 490.

Dr. Gurbani's theories of potential liability based on allegations of intentional, bad-faith conduct appear to be mutually exclusive. Her theory of liability on the part of the University requires proof that its employees acted within the scope of their employment; her theory of personal liability on the part of the three University employees requires proof that they acted outside the scope of their employment. To make a sufficient showing under either theory, Dr. Gurbani needed to do more than simply allege that her evaluators had improper motives. Where a plaintiff's claim depends on an issue of a defendant's bad faith, the defendant is entitled to summary judgment absent "a showing, supported by particular facts sufficient to allow a fact finder to conclude that [the defendant] lacked good faith[.]" *Rite Aid Corp. v. Hagley*, 374 Md. at 688.

This burden is certainly no lower when a plaintiff attempts to show that an educator acted out of ill will. With respect to the Hunters' allegations that certain educators "intentionally and maliciously acted to injure their child[,]" the Court of Appeals observed that "a claimant will usually face a formidable burden in attempting to produce adequate evidence to establish the intent requirement" for an intentional tort by an educator. *Hunter v. Bd. of Educ. of Montgomery Cnty.*, 292 Md. at 490. A claim that "turns on the animosity" of an educator may survive a motion for summary judgment "only where solid circumstantial evidence exists" to prove the educator's mental state. *Clements v. Nassau County*, 835 F.2d at 1005. Indeed, a plaintiff "bears a heavy burden" in attempting to show that an academic dismissal "resulted from . . . bad faith conduct" of educators. *Gupta v. New Britain Gen. Hosp.*, 687 A.2d at 121. "As with [Dr. Gurbani's] claim of deficiencies in [her residency] training, we approach with caution, and with deference to academic decisionmaking, [her] challenge to the motivation of the [program] in terminating [her] residency." *Id.* at 120.

Dr. Gurbani has not identified direct evidence that any of the defendants evaluated her based on anything other than the honest use of professional judgment. All assessments in the record from Dr. Osgood and Dr. Hasenboehler expressly related to genuine criteria of academic performance. Their comments at faculty meetings and on written evaluations, while sometimes harsh, were no more extreme than comments from other evaluators. Dr. Gurbani nevertheless attempts to ascribe hidden, sinister motives onto these evaluations and to other arguable failings in the educational process.

In her view, when Dr. Osgood and Dr. Hasenboehler voiced concerns about her

51

performance at faculty meetings, they must have been "falsely disparag[ing] her" to their colleagues. Dr. Gurbani argues that, when Dr. Hasenboehler said that she would need to work much harder as a female surgeon, he must have been expressing sexism instead of merely advising her (as others had done) that she probably would encounter sexism in her career. She argues that, when Dr. Osgood and Dr. Hasenboehler neglected to submit written evaluations promptly or to schedule weekly meetings, they must have been deliberately "withh[olding] feedback" "so that [she] could not address issues." She also argues that, when Dr. Osgood belatedly submitted a written evaluation that identified performance issues for her to address, his evaluation is so negative that it must be "highly suspect and likely fabricated[.]"

In Dr. Gurbani's view, when Dr. LaPorte asked a colleague about what documents would be needed for the possibility that she might dismiss Dr. Gurbani, Dr. LaPorte must have "immediately" decided to terminate her six months before the fact. When Dr. LaPorte informed other residents that Dr. Gurbani had been placed on academic probation, Dr. Gurbani argues that Dr. LaPorte must have been trying to "humiliate[]" her, rather than to enlist help. When Dr. LaPorte reminded Dr. Osgood and Dr. Hasenboehler to put their evaluations in writing just before the probation committee meeting, Dr. Gurbani argues that Dr. LaPorte must have been "tr[ying] to gather fabricated evaluations[.]" When Dr. LaPorte and other University officials confronted Dr. Gurbani about the false statements she made on her registration with the Board of Physicians, Dr. Gurbani argues that they must have been "creat[ing] a story to justify the termination." When Dr. LaPorte turned over reports of incidents such as the dural tear

52

and missed diagnosis of compartment syndrome (incidents for which Dr. Gurbani denies responsibility), Dr. Gurbani argues that Dr. LaPorte must have been "misleading" the grievance panel about the real reason for the dismissal.

These actions by the defendants are not evidence of dishonesty but the very actions that Dr. Gurbani hopes to prove were done dishonestly. Stripped of her self-reinforcing suspicions, the actual evidence of the defendants' conduct does not suggest bad faith. *See Clements v. Nassau County*, 835 F.2d at 1005 (reasoning that resident's assertion that "the faculty 'must have resented' her appeals" of her grades to administration officials was not evidence of animus where there was "no indication of any such hostility in the record"). To the extent that she argues that the defendants knowingly made false reports, her mere denials of their reports cannot be sufficient evidence of bad faith. *See Educ. Testing Serv. v. Hildebrant*, 399 Md. 128, 142 (2007) (rejecting argument that plaintiff's affidavit stating that a test administrator's report of plaintiff's conduct was "false in every respect" and "contrary to any reasonable understanding or interpretation of anything that could have been observed" generated a genuine dispute about whether the test administrator made report in bad faith). To the extent that she argues that the three defendants should have done a better job to help her advance in the program, their arguable failings are not sufficient evidence of bad faith. *See Rite Aid Corp. v. Hagley*, 374 Md. at 687 ("the availability of other alternatives, and the possibility, even probability, that the situation might have, or should have, been handled more effectively and sensitively, while perhaps suggesting negligence, does not equate to bad faith or a lack of good faith").

53

The only factual basis that Dr. Gurbani offers for interpreting the defendants' actions as dishonest seems to be a loose and flexible theory that they had some shared motive to lie about her performance. The defendants are not exaggerating when they call this a "conspiracy" theory. In her reply brief, Dr. Gurbani expressly accuses the defendants of engaging in a "conspiracy" to falsify their evaluations so as "to paper over a planned termination." She asserts that she had no "significant issues with her performance" until her first orthopaedic trauma rotation, during which she started to complain to Dr. LaPorte about the conduct of Dr. Osgood and Dr. Hasenboehler. She insists that all of the "supposed negative evaluations" occurred after Dr. Osgood and Dr. Hasenboehler made "scathing" remarks about her performance at a faculty meeting on May 24, 2012. Through this imaginative chain of *post hoc ergo propter hoc* reasoning, she insists that a jury could conclude that "she was placed on probation . . . because of her complaints" against them.

Even if evidence of a mere motive to retaliate would be enough to infer that certain actions were taken with a retaliatory purpose, Dr. Gurbani needed to present "evidence of retaliatory motive 'in detail and with precision,' as required to fend off [a motion for] summary judgment." *Freilich v. Upper Chesapeake Health Sys., Inc.*, 423 Md. 690, 694 (2011). At a minimum, she needed to connect the alleged retaliatory motive to the actions that it allegedly motivated. *See id.* at 719.

There is no genuine dispute that other faculty members independently identified underlying issues with Dr. Gurbani's clinical performance months before her first orthopaedic trauma rotation. The faculty's concerns involved both her technical skills

54

and the mental aspects of her performance. These issues were communicated to her promptly in the evaluations of Dr. Cosgarea and Dr. Sponseller on the two preceding rotations. The memo from May 4, 2012, the date of the first meeting of the orthopaedic trauma rotation, documented that Dr. Osgood and Dr. Hasenboehler were already voicing concerns about "her ability to evaluate patients and make decisions," just as their predecessors had.

In contrast to the precise sequence of Dr. LaPorte's memos, Dr. Gurbani's testimony is vague as to when she made her various complaints. By her own admission, she does "not recall an exact date and time" when she started complaining, nor can she "recall . . . years later precisely what [she] told Dr. LaPorte" at particular meetings. She testified that she started complaining "very early" in the rotation, possibly as early as April 2012. Yet she also submitted a written timeline of meetings, which indicates that she was unable to discuss issues about the rotation with Dr. LaPorte until the meeting of May 4, 2012. She testified that she continued to raise "many issues" about the two attending physicians over several months, and the issues varied in severity. Her testimony lacks enough detail to permit a finding that she made severe complaints about either Dr. Osgood or Dr. Hasenboehler or both before they were already voicing concerns about her performance.[22]

Furthermore, there is no testimony showing that Dr. LaPorte even told Dr. Osgood

---

[22] In her brief, Dr. Gurbani asserts that she "reported Dr. Osgood's and Dr. Hasenboehler's mistreatment of her" "approximately two weeks" before the faculty meeting of May 24, 2012. Using that estimate, the performance issues that they had identified over 20 days earlier would appear to predate her complaints.

or Dr. Hasenboehler about her complaints against them before they had started to criticize her performance. Even if one could infer that they somehow knew of her complaints by that time, that inference would do little to explain why they would feel so incensed or threatened that they would wage a months-long retaliatory campaign against her. It would do even less to explain why Dr. LaPorte would agree to collaborate with their alleged efforts, as her conduct was not part of the complaints. It would do even less to explain why she received what were unquestionably poor evaluations from Dr. Ain and from Dr. Tis in May and June of 2012.[23] It would do nothing to explain why, in connection with the faculty meeting on May 24, 2012, six doctors other than Dr. Osgood and Dr. Hasenboehler expressed significant concerns about Dr. Gurbani's performance based on their own independent observations.

Perhaps because of the flimsiness of her conspiracy theory, Dr. Gurbani has gone to elaborate lengths to portray the assessments of Dr. Osgood and Dr. Hasenboehler as outliers. In reality, their assessments were fully consistent with those of other medical professionals who observed her performance, particularly her performance on the two previous rotations. Other doctors, without any hint of a retaliatory motive, said that she made "a number of significant and avoidable errors" in "what should have been straightforward . . . bread-and-butter pediatric trauma" cases; that she "seem[ed] to show global lack of information synthesis and lack of a plan" even where the "plan of care

---

[23] Dr. Gurbani believes that comments made by Dr. Osgood and Dr. Hasenboehler on May 24, 2012, caused other faculty members to submit negative evaluations. Yet Dr. Tis also submitted a highly negative evaluation on May 11, 2012.

seemed obvious"; that she "had problems with thought process" and "just misse[d] some of the basic points that most residents would pick up on"; that she lacked "even a basic idea" of what a certain routine procedure was, could not "figure out how to apply basic tools to [the] spine," and "[o]ften confuse[d] clockwise vs. counterclockwise rotation of screws." To her credit, some evaluators believed that she might have succeeded in the program if given additional chances to improve. But there is no evidentiary basis to conclude that her probation and dismissal resulted from the dishonesty of her evaluators.

Despite Dr. Gurbani's efforts to generate suspicion about the motives of certain decision-makers, she has not identified facts in detail and with precision to support the allegations that her evaluators acted in bad faith. *See Educ. Testing Serv. v. Hildebrant*, 399 Md. at 142-43. "Without any factual evidence to support her allegations, there is no *genuine* dispute as to a material fact." *Id.* at 142 (emphasis in original). She may not use the courts to nullify their academic decisions.[24]

**CONCLUSION**

The circuit court did not err when it granted summary judgment against Dr. Barkha Gurbani as to all claims seeking damages resulting from her academic dismissal. The court was required not to disturb the careful and deliberate decisions made by the

---

[24] To the extent that Dr. Gurbani's allegations of bad faith are supposed to support her claims of intentional interference with contract, they are inadequate for the additional reason that she had insufficient evidence that the University breached the contract or that she suffered damages as a result of any such breach. *See Bagwell v. Peninsula Reg'l Med. Ctr.*, 106 Md. App. 470, 503 (1995). Drs. Osgood, Hasenboehler, and LaPorte cannot be liable for tortiously inducing the University to breach a contract, if the University did not actually breach the contract or if the breach resulted in no damages.

University's professional faculty. Dr. Gurbani's thorough search for some factual and legal basis to circumvent that principle is to no avail.

On a final note, we further agree with the University's observation that Dr. Gurbani's exhaustive set of challenges to its academic decisions "underscores why the court was right to grant summary judgment." *Hunter*, and the larger body of law requiring deference to academic decisions, wisely counsel against putting these types of academic evaluations on trial.

JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID BY APPELLANT.

<u>**APPENDIX**</u>

In her appellate brief, Dr. Barkha Gurbani presented the following questions:

1. Did the Circuit Court improperly grant summary judgment on Dr. Gurbani's claim for breach of contract (Count I) related to two Resident Contracts with Dr. Gurbani because it found that *Hunter v. Bd. of Educ. of Montgomery Cty*, 292 Md. 481, 482-87 (1982) bars educational negligence and breach of contract actions related to conducting student evaluations?

2. Does the Court's holding in *Hunter*, 292 Md. at 482-87 bar breach of contract actions by medical residents in residency programs?

3. Did the Circuit Court improperly grant summary judgment on Dr. Gurbani's claim for breach of the covenant of good faith and fair dealing (Count II), based upon a finding that Maryland does not recognize a separate cause of action for breach of the covenant of good faith and fair dealing?

4. Does the Court's holding in *Kaye v. Wilson-Gaskins*, 227 Md. App. 660, 676 (2016) bar a breach of the implied covenant of good faith and fair dealing claim?

5. Does the Court's holding in *Hunter*, 292 Md. at 482-87 bar claims of negligent retention and supervision?

6. Did the Circuit Court improperly grant summary judgment on Dr. Gurbani's actions against Appellees Johns Hopkins Health Systems Corp., Johns Hopkins Hospital, Inc., Johns Hopkins Medicine, and Johns Hopkins University for negligent retention and supervision?

7. Did the Circuit Court improperly grant summary judgment on Dr. Gurbani's claim against Appellees Greg Osgood, M.D., Erik Hasenboehler, M.D., and Dawn LaPorte, M.D., for tortious interference with contract based upon a finding that Appellees Osgood, Hasenboehler, and LaPorte were acting on behalf of an employer within the scope of their authority?

8. Did the Circuit Court improperly grant summary judgment by ignoring and failing to evaluate the extensive record of evidence submitted by Plaintiff?